ACCEPTED
03-14-00605-CR
6699641
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/28/2015 12:12:40 PM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00605-CR

## IN THE COURT OF APPEALS

## THIRD DISTRICT OF TEXAS

## AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/28/2015 12:12:40 PM
JEFFREY D. KYLE
Clerk

| | | |
|---|---|---|
| HOWARD THOMAS DOUGLAS | § | APPELLANT |
| VS. | § | |
| THE STATE OF TEXAS | § | APPELLEE |

### APPEAL FROM THE 331ST JUDICIAL DISTRICT COURT

### TRAVIS COUNTY, TEXAS

### CAUSE NO. D-1-DC-12-900059

### STATE'S BRIEF

**ROSEMARY LEHMBERG**
District Attorney
Travis County, Texas

**Lisa Stewart**
Assistant District Attorney
State Bar No. 06022700
Lisa.Stewart@traviscountytx.gov
AppellateTCDA@traviscountytx.gov
P.O. Box 1748
Austin, Texas 78767
(512) 854-9400
Fax No. 854-4810

Oral Argument Not Requested

1

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... 2

INDEX OF AUTHORITIES ............................................................................. 3

STATEMENT OF THE CASE .......................................................................... 4

STATEMENT OF FACTS FROM GUILT/INNOCENCE ........................................ 5

SUMMARY OF THE ARGUMENTS ................................................................ 25

STATE'S REPLY TO APPELLANT'S FIRST POINT OF ERROR ...................... 28

The evidence was legally sufficient to establish beyond a reasonable doubt that appellant committed securing execution of a document by deception as alleged in the indictment. .......28

State's Reply to Appellant's Second Point of Error ...................................................... 39

Appellant failed to preserve any alleged error for review, as his claim on appeal differs from his trial objection. Alternatively, the trial judge did not abuse his discretion in excluding irrelevant evidence of TMIC's funding of the Workers' Compensation Fraud Unit................39

PRAYER .................................................................................................... 44

CERTIFICATE OF COMPLIANCE ................................................................. 45

CERTIFICATE OF SERVICE ......................................................................... 45

# INDEX OF AUTHORITIES

**Cases**

*Adelman v. State,* 828 S.W.2d 418 (Tex.Crim.App. 1992) ......................................................29

*Barnes v. State*, 62 S.W.3d 288 (Tex.App. – Austin 2001, pet.ref'd.) .....................................30

*Bennett v. Grant*, 460 S.W.3d 220 (Tex.App. - Austin 2015, pet. filed) ....................................36

*Bowden v. State,* 628 S.W.2d 782 (Tex.Crim.App. 1982) ........................................................29

*Briones v. State*, 76 S.W.3d 591 (Tex. App. - Corpus Christi 2002, no pet.) ............................36

*Cain v. State,* 958 S.W.2d 404 (Tex.Crim.App. 1997) .............................................................29

*Dillon v. State*, 574 S.W.2d 92 (Tex.Crim.App. 1978) .............................................................29

*Douglas v. State*, No. 03-13-00092-CR, delivered August 26, 2015 (memorandum opinion) ....35, 43

*Dues v. State*, 634 S.W.2d 304 (Tex.Crim.App. 1982) .............................................................30

*Goldstein v. State*, 803 S.W.2d 771 (Tex.App. – Dallas 1991, pet.ref'd.) ................. 25, 30, 35, 36

*Gollihar v. State*, 46 S.W.3d 243 (Tex.Crim.App. 2001) ..........................................................37

*Green v. State*, 934 S.W.2d 92, 101-102 (Tex. Crim. App. 1996), *cert.denied*, 520 U.S. 1200 (1997) ..................................................................................................................42

*Hill v. State*, 161 S.W.3d 771 (Tex.App. – Beaumont 2005, no pet.) .........................................29

*Hooper v. State*, 214 S.W.3d 9 (Tex.Crim.App. 2007) ............................................................28

*In re E.P.*, 185 S.W.3d 908 (Tex. App. - Austin 2006, no pet.) .................................................30

*Jackson v. Virginia*, 443 U.S. 307 (1979) ............................................................................28

*Margraves v. State*, 34 S.W.3d 912 (Tex.Crim.App. 2000) (Johnson, J., concurring) ................31

*Matson v. State,* 819 S.W.2d 839 (Tex.Crim.App. 1991) ........................................................29

*McCain v. State*, 22 S.W.3d 497 (Tex.Crim.App. 2000) ..........................................................28

*Mills v. State*, 722 S.W.2d 411 (Tex.Crim.App. 1986) ............................................................33

*Moore v. State*, 969 S.W.2d 4 (Tex.Crim.App. 1998) ..............................................................29

*Norwood v. State*, 135 Tex. Crim. 406, 120 S.W.2d 806 (Tex.Crim.App. 1938) .......................30

*Oler v. State*, 998 S.W.2d 363 (Tex. App. - Dallas 1999, pet.ref'd., untimely filed) ..................30

*Rogers v. State*, 111 S.W.3d 236, 243 (Tex. App. – Texarkana 2003, no pet.) ..........................42

*Russo v. State*, 228 S.W.3d 779 (Tex.App. – Austin 2007, pet.ref'd.) ......................................29

*Turro v. State*, 867 S.W.2d 43 (Tex.Crim.App. 1993) .............................................................28

*Willbur v. State*, 729 S.W.2d 359 (Tex.App. – Beaumont 1987, no pet.) ...................................30

*Wilson v. State*, 71 S.W.3d 346 (Tex.Crim.App. 2002) ...........................................................41


**Statutes**

V.T.C.A. Penal Code §1.07(a)(25) .........................................................................................31

V.T.C.A. Penal Code §31.01 .................................................................................................33

V.T.C.A. Penal Code §32.46 ...........................................................................................passim


**Rules**

Tex.R.App.Proc. 33.1 ...........................................................................................................42

Tex.R.App.Proc. 9.4(e) .........................................................................................................45

Tex.R.App.Proc. 9.4(i)(2)(A) .................................................................................................44

Tex.R.Evid. 403 ...............................................................................................................40, 41

**NO. 03-14-00605-CR**

**IN THE COURT OF APPEALS**

**THIRD DISTRICT OF TEXAS**

**AUSTIN, TEXAS**

| | | |
|---|---|---|
| HOWARD THOMAS DOUGLAS | § | APPELLANT |
| VS. | § | |
| THE STATE OF TEXAS | § | APPELLEE |

**APPEAL FROM THE 331ST JUDICIAL DISTRICT COURT**

**TRAVIS COUNTY, TEXAS**

**CAUSE NO. D-1-DC-12-900059**

**TO THE HONORABLE COURT OF APPEALS:**

Now comes the State of Texas and files its brief in response to that of the appellant.

**STATEMENT OF THE CASE**

The State indicted appellant for the third-degree-felony of securing execution of a document by deception. V.T.C.A. Penal Code §32.46(b)(5). (CR 12-18). Appellant pled not guilty and had a jury trial on guilt/innocence. (RR II: 7, 23). The jury found appellant guilty of securing execution of a document by deception as alleged in the indictment. (CR 182; RR VI: 47-48). The trial judge

4

assessed appellant's punishment at five years confinement in the Texas Department of Criminal Justice – Institutional Division.  (CR 194).  Appellant timely filed a motion for new trial, which was overruled by operation of law.  (CR 202-206).  Appellant timely filed notice of appeal.  (CR 207).  The trial judge certified appellant's right to appeal.  (CR 186).

## STATEMENT OF FACTS FROM GUILT/INNOCENCE

**Designated-Doctor Examinations (DDEs) and Functional Capacity Evaluations (FCEs)**

Dr. Daniel Boudreau was a designated doctor for the State of Texas.  (RR II: 60).  He explained that a designated doctor was a physician who evaluated injured workers and was encouraged to be an independent evaluator.  (RR II: 60).  Dr. Boudreau referred to his designated-doctor patients as "claims" as they were assigned by the Texas Department of Insurance, Division of Workers' Comp.  (RR II: 60-61).  He had no doctor-patient relationship with the claims.  (RR II: 61).

Dr. Boudreau worked with North Texas Medical Evaluators (NTME) in what he thought was an independent contractor capacity.  (RR II: 61).  He worked with NTME from 2007 to 2009.  (RR II: 64-65).  He gave NTME his medical license number for reports and billing and a signature stamp.  (RR II: 69-70, 72-72).  But, he did not recall giving NTME a power of attorney.  (RR II: 69-70).  Dr.

NTME did not assign patients to Dr. Boudreau, but it assisted him with scheduling patients and submitting designated-doctor reports. (RR II: 62).

For designated-doctor appointments, Dr. Boudreau received 60% of the money collected and NTME took 40% for doing the paperwork and collections. (RR II: 65). Dr. Boudreau received none of the money collected for FCEs. (RR II: 65). Dr. Boudreau generally ordered an FCE where a person had a musculoskeletal or limb problem, but he did not order them as a matter of course. (RR II: 66, 69). He only "might" order an FCE on a person who had already returned to work. (RR II: 69). If Dr. Boudreau had an issue with being paid by NTME, he contacted appellant.[1] (RR II: 62).

The designated-doctor evaluation was completely separate from the FCE. (RR II: 80). A technician who conducted the FCEs attended the appointments. (RR II: 67). The technician sent the results of the FCEs to Dr. Boudreau via email. (RR II: 78). FCEs generally took 30-40 minutes to complete; Dr. Boudreau had never known an FCE to take 4 hours. (RR II: 68).

State's exhibit 29 contained a letter presumably written by Dr. Boudreau ordering an FCE for Barbara Boles. (RR XII: 266). Dr. Boudreau thought the signature on the letter was very similar to his own, but he could not tell at the time of trial whether the signature was his or made by the signature stamp. (RR II: 71-

---

[1] Dr. Boudreau identified appellant in the courtroom. (RR II: 63).

6

72). The letter had Dr. Boudreau's name at the top, but Dr. Boudreau did not generate that document. (RR II: 72). The letter, dated April 15, 2009, reflected that he ordered an FCE on Barbara Boles after doing a designated-doctor exam on "him." (RR II: 72). A second page of the document showed that the FCE lasted for 3 ½ hours, but Dr. Boudreau had never seen an FCE last that long. (RR II: 72).

State's exhibit 30, medical billing documents for Jimmy Gomez, also contained a document with a signature similar to Dr. Boudreau's, but again he could not verify if that were his actual signature or a signature stamp because he did not generate that document either. (RR II: 73). The document bore letterhead from "Marconi Physical Performance Testing," a company which Dr. Boudreau did not know existed until recently. (RR II: 79-80). Dr. Boudreau did not work for Marconi Physical Performance Testing or recall ever going to their offices. (RR II: 63-64). State's exhibit 30 also reflected an FCE lasting from 10:30 a.m. to 2:30 p.m., but Dr. Boudreau did not recall the occurrence of that FCE. (RR II: 73). Dr. Boudreau had no knowledge that FCEs were being billed out at 16 units per patient. (RR II: 80).

Martha Luevano managed the Division of Worker's Compensation, medical fee dispute resolution, for the Texas Department of Insurance (TDI). (RR III: 10). The TDI and the Division of Workers' Compensation regulated the Texas Mutual

7

Insurance Company (TMIC). (RR III: 16). Luevano testified as an expert in medical billing based on her training and experience. (RR III: 12).

Luevano explained the many acronyms used during this trial and that the CPT[2] code for an FCE was 97750. (RR III: 13-14). "HCFA" was an acronym used for the Centers for Medicare and Medicaid Services before it took on that name. (RR III: 14). HCFA stood for Health Care Finance Administration before the name change, and it typically referred to a paper billing form, the HCFA 1500. (RR III: 14). The CMS 1500 was also a paper billing form that was used to bill for certain professional medical services. (RR III: 15). Luevano used interchangeably the terms CMS 1500 and HCFA 1500 in explaining their purpose. (RR III: 15). Texas Workers' Compensation used "DDE" for designated-doctor examination, and it had its own CPT code and rules for billing and reimbursement. (RR III: 15-16).

Luevano explained that an FCE was a technical examination that was billed and paid separately from a DDE. (RR III: 16). With regard to CPT code 97750, the AMA CPT code book for 2007 (SX 28) required "one-on-one patient contact, . . ., physical performance test or measurement, with written report each 15 minutes." (RR III: 20). The CPT code book for 2008 also required "direct one-on-

---

[2] "CPT" stands for American Medical Association Current Procedural Terminology. (RR III: 14).

one patient contact, physical performance test or measurement, with report each 15 minutes." (RR III: 20-21; SX27). The 2009 CPT code book required the same. (RR III: 21; SX32). The code books for 2006-2009 all required the same direct one-to-one patient contact, face-to-face, where the patient actually performed the physical acts of the examination. (RR IV: 7-8).

On cross-examination, Luevano explained that SX26, the billing documentation or Joann Jackson, was "technically" not an HCFA 1500 but rather the more modern version of it, known as the CMS 1500. (RR II: 70-71; RR III: 27-28). Luevano added that Form 1500 was prepared by the healthcare provider and sent to the insurance carrier. (RR III: 28). Based on that form, the insurance carrier determined what payment to make; the form contained a medical diagnosis via certain codes. (RR III: 28).

As for CPT code 97750, Medicare policy dictated that a healthcare provider could bill one unit for each 15 minutes spent in direct, one-on-one contact with a patient. (RR III: 38-39). Any time that a patient was not actively engaged in the physical performance examination, tests or measurements was not billable. (RR III: 47, 48). Code 97750 required the healthcare provider to prepare a written report for a FCE, which differed from the report written by the designated doctor. (RR III: 39, 40).

Luevano further explained on redirect examination that a healthcare provider could not bill for the time spent preparing the written report, reviewing medical records, or travelling to the location for an FCE. (RR III: 41-42, 48; RR IV: 8). The maximum allowable units that could be legally billed were 16, which equaled 4 hours, for an FCE. (RR III: 42). Medicare policy allowed for rounding up to one 15-minute increment, viz: eight minutes spent with a patient could be rounded up to one 15-minute allowable unit. (RR III: 42). The healthcare provider was responsible for correctly coding and billing for services. (RR III: 42-43).

Kathleen Haden, a senior investigator for TMIC, had been the supervisor for the Healthcare Fraud and Abuse Unit in February of 2012. (RR III: 53).[3] Haden identified SX30 as an HCFA 1500, a health insurance claim form that all doctors and medical providers used nationally to bill their services. (RR III: 54). State's Exhibit 30 was designated "1500" at the top of the page, but it reflected "CMS 1500" at the bottom right in small print. Haden noted it used to be HCFA Form 1500, but the name of the form changed to CMS 1500 when the Centers for Medicaid and Medicare took over for the Health Care Finance Administration. (RR III: 54). Persons in the business still called the CMS 1500 form by the name HCFA 1500. (RR III: 54, 127). The term "HCFA" was commonly used within the

---

[3] Haden confirmed that TMIC was located in Austin, Travis County, Texas. (RR III: 54).

10

industry. (RR III: 55). The HCFA form would be sent to the TMIC to trigger a payment of some sort. (RR III: 55).

Haden explained that TMIC received notice from the TDI when a patient was scheduled for a designated-doctor examination. (RR III: 60). The TDI then chose the doctor and coordinated the date and time of the appointment. (RR III: 60). The TDI notified TMIC of this appointment via an EES-14 form, which reflected the appointment time and date. (RR III: 60-61). The injured worker was required to show up at that date and time. (RR III: 61).

**Testimony from Injured Workers Who Received FCEs**

On July 20, 2007, Jerry Dockray sustained a significant injury to his back, four discs in his spine, and his shoulders from a hay-wrapping machine. (RR II: 108-109). Dockray's employer had Worker's Compensation insurance with TMIC, and Dockray filed a claim. (RR II: 109, 114). Almost a year after his injury, Dockray had surgery on his neck and then later on his shoulder. (RR II: 109).

After his surgeries, in February of 2009, Dockray travelled from his home in Paris, Texas, to Sulphur Springs, Texas, for an appointment with a doctor that he had not seen before.[4] (RR II: 110, 116). The appointment was not in a doctor's

---

[4] The doctor was also not from Sulphur Springs and had travelled there for the appointment. (RR II: 117).

11

office or a hospital but in a fitness center "or something like that." (RR II: 110). The office space consisted of an office on one side, a waiting room in front, and a small examination room with no equipment. (RR II: 110). The doctor explained the purpose of the examination to Dockray, to-wit: to determine the extent of his injury. (RR II: 111). Dockray spent only 5-10 minutes with the doctor. (RR II: 113).

An assistant then had Dockray perform a few tests such as lifting his arm without assistance and sliding his arm up a wall to determine his range of motion. (RR II: 111, 112). These tests took about 20 minutes, and the doctor did not observe Dockray perform these tests. (RR II: 113). Dockray was not asked to lift anything such as weights or pull anything. (RR II: 112). He did not walk on a narrow beam or a treadmill or ride a stationary bike. (RR II: 112). He did not tell the medical personnel that he could lift 62 pounds or pull 85 pounds. (RR II: 111, 112). Dockray's entire appointment lasted only about 45 minutes. (RR II: 112).[5]

Brad Ettinger, owner of a power washing business in Bulverde, Texas, injured his shoulder on the job in 2007. (RR III: 133-134). Ettinger sought medical treatment and filed a Worker's Comp claim. (RR III: 134). Ettinger

---

[5] Dockray testified that Sulphur Springs was about an hour from Paris, and he recalled commenting to his wife that it took him longer to get to the appointment than it did for the examination. (RR II: 110, 112).

12

underwent reconstructive surgery on his shoulder and several weeks of rehabilitation. (RR III: 135).

At some point, Ettinger received a letter instructing him to see a doctor that he had not previously seen. (RR III: 135). He travelled more than an hour to a small office in Seguin. (RR III: 136). After waiting for about an hour, Ettinger finally saw appellant. (RR III: 137). Appellant asked Ettinger a few questions and told him a technician would conduct some assessments on his mobility and strength. (RR III: 137). Appellant did not conduct any of the assessments. (RR III: 137). A technician had Ettinger perform range of motion and strength tests. (RR III: 138). The physical part of the exam took less than one hour. (RR III: 138). The records of Ettinger's examination and the corresponding claim forms submitted to TMIC were admitted into evidence as SX36, which reflected that appellant billed for 16 units of time. (RR III: 204; RR XII: 248).

On January 23, 2009, Joann Jackson suffered an injury to her knee while working as a school crossing guard. (RR II: 49-50). Jackson's employer filed a worker's compensation claim and sent her to a doctor for designated-doctor exams in March and April. (RR II: 50). Jackson underwent an FCE in which the doctor raised her leg and bent her knee while she laid on a table. (RR II: 50-51). As part of the FCE, Jackson also stood beside the examination table, lifted her leg, and

13

bent her knee. (RR II: 51). She did not get on a treadmill or carry anything for the doctor's evaluation. (RR II: 51).

Documents contained in State's exhibit 26 reflected that Jackson's FCE lasted four hours, from 12:00 to 4:00 p.m., but Jackson testified that "no way" was she there for four hours. (RR II: 52, 54). The exhibit further reflected that Jackson underwent various tests, which she wholly denied. (RR II: 52-54). Specifically, Jackson was not asked to stand for over 30 minutes, sit for over 30 minutes, walk three miles, push or pull anything, get on a bike or a treadmill, or lift any weights. (RR II: 52-53). Jackson did not discuss her lifting capacity with the doctor or tell him that her capacity was either 42 or 86 pounds. (RR II: 53).

**Appellant's Business and Improper Billing Practices**

Tamara Wells worked for appellant at NTME from 2009 to 2011 doing his accounts receivable i.e., billing, calling insurance companies regarding submitted bills, and checking if accounts were paid. (RR IV: 32, 44). Appellant ran NTME, which was a designated doctor scheduling company. (RR IV: 33). Appellant initially had approximately 30 doctors working for him as independent contractors. (RR IV: 34). As part of that employment arrangement, appellant required the doctors to give him and NTME a power of attorney and their medical license and social security numbers so that NTME could bill under the doctors' names along

with the company, sign the doctors' names to reports, do FCEs, and do the doctors' scheduling without actually contacting the doctors. (RR IV: 34, 73).

NTME rented space all over Texas for the DDEs and the FCEs. (RR IV: 61). The rentals were done on an hourly basis, and the maximum time spent on a rental for a day was between two to three hours. (RR IV: 61). NTME had five rental facilities at the most on any given day. (RR IV: 62).

Javier Jimenez worked for NTME as a licensed FCE technician from 2009 to 2011. (RR II: 82, 90). Jimenez recognized State's exhibits 11 and 13 as articles of incorporation for NTME and Marconi Physical Performance Testing, LLC, respectively. (RR II: 88). Appellant was associated with both companies as manager or owner. (RR II: 88). Jimenez testified, based on his conversations with appellant[6], that NTME had difficulty collecting from TMIC so appellant created Marconi so that TMIC would pay for the FCEs. (RR II: 88-89). If a patient were a TMIC patient, then Jimenez used Marconi letterhead in conjunction with the FCEs. (RR II: 89).

As a technician for NTME, Jimenez performed FCEs, range of motion tests, and occasionally nerve-conducting tests. (RR II: 90). NTME technicians utilized a one-page form when evaluating each patient. (RR II: 90-91). Appellant instructed Jimenez to have the patient answer each question on the form, enter the

_____

[6] Jimenez identified appellant in court. (RR II: 92-93).

15

information into the program, and email the report to the designated doctor and to NTME. (RR II: 92, 105). The designated doctor for each patient did not direct the examination because "that's what the sheet of paper was for." (RR II: 104). Appellant told Jimenez to do an FCE on every patient. (RR II: 100, 105, 106).

Jimenez conducted FCEs all over the state of Texas for NTME. (RR II: 91). The examinations were conducted in rented spaces in chiropractic offices, doctors' offices, or standard office space. (RR II: 95). The facilities did not have weights, stationary bikes, treadmills, or any type of exercise equipment. (RR II: 95). Jimenez conducted the FCEs only with "a big object that we used to measure the pushing, pulling, grasping." (RR II: 94). NTME paid for the rental expenses and Jimenez's travel expenses. (RR II: 93). NTME also paid Jimenez an incentive of $25 for each FCE he conducted. (RR II: 94). Jimenez did not know the number of FCEs he conducted for NTME, but he testified that "whenever we would get a set of five, that's how many we would do for the day." (RR II: 103).

Jimenez never spent four (4) hours conducting an FCE. (RR II: 94). Jimenez took only 15 to 40 minutes to conduct an FCE, depending on the patient's injury, and approximately 10-15 minutes to input the information into the computer. (RR II: 94, 106). The FCE was done according to NTME's one-page protocol. (RR II: 95). Jimenez recorded the start and stop times for each FCE on the one-page protocol. (RR II: 96). Jimenez did not know who put the start and

16

stop times on the FCE Statement of Medical Necessity included in SX30, the billing documents for Jimmy Gomez, but it was not the correct time. (RR II: 97).

Toward the end of Jimenez's employment with NTME, appellant and Lena Shockley[7] told Jimenez not to perform FCEs on TMIC patients because NTME wasn't being paid for them. (RR II: 92). Jimenez quit NTME in December of 2011 because he was not being paid. (RR II: 104-105).

Jose Saldivar worked for NTME from March of 2009 to December of 2011 as a medical technician. (RR III: 140-141, 154). Appellant hired him. (RR III: 141-142). He assisted physicians with range of motion evaluations and girth measurements. (RR III: 141, 144, 147-148). Saldivar was familiar with Marconi as the company used to bill for the FCEs, but he did not work for that company. (RR III: 140, 142).

When asked if he conducted FCEs, Saldivar answered, "Well, what we did is we filled out a template" provided by NTME. (RR III: 141). The template was one page. (RR III: 155). Appellant had a standing order that a template would be filled out for each NTME patient. (RR III: 143). That template was then converted into an FCE, so that an FCE was done on every patient. (RR III: 143-144). It took Saldivar 10-15 minutes at the least to 30 minutes at the most to fill out the template, i.e. to do an FCE. (RR III: 143). He knew the time because "we

---

[7] Shockley handled accounts receivable for appellant. (RR IV: 65).

17

would just keep an eye on [the clock], because we knew the time we walked into that clinic and the time we left." (RR III: 154). Saldivar never spent 4 hours doing an FCE. (RR III: 143).

Saldivar performed FCEs done at the main office of NTME. (RR IV: 35). Approximately eight patients were seen on a daily basis. (RR IV: 35). The patients spent "15 minutes at the most" in the examination room actually getting an FCE. (RR IV: 36). In spite of this, appellant directed Tamara Wells to bill for 16 units, or 4 hours, for the FCE. (RR IV: 36). Wells had never seen a patient stay for 4 hours. (RR IV: 37). All the money from the FCEs went to appellant. (RR IV: 61).

Wells knew that appellant's manner of billing was wrong. (RR IV: 39). She felt particularly uncomfortable when the company billed under the doctors' names, as she had to copy and paste the doctors' signatures from their contracts to the billing documents. (RR IV: 39). Wells felt that she was forging the W-9s that had to be sent with the reports. (RR IV: 39-40).

Appellant hired Lena Shockley to do accounts receivable for NTME in October of 2008. (RR IV: 65). Shockley quit in January of 2012 when NTME had no doctors or technicians left, her paycheck bounced, and appellant accused her of improprieties with money. (RR IV: 66-67, 86). Shockley admitted that she fabricated facts for appellant when she first met with investigators and the

18

prosecutor in this case. (RR IV: 67). Shockley lied and told the State that she knew nothing about the FCEs, about how they were done, or how they were billed. (RR IV: 68-69). Later, Shockley called the prosecutor, admitted that she had been lying, and now wanted to tell the truth about NTME. (RR IV: 69).

In truth, Shockley knew that an FCE was being done on every patient. (RR IV: 69). Per appellant's orders, Shockley instructed the technicians to conduct an FCE on every patient except for TMIC patients because in 2009 TMIC wouldn't pay for the FCEs. (RR IV: 69-70). So, appellant created Marconi Physical Performance Testing to trick TMIC into paying for FCEs. (RR IV: 71). Shockley and appellant created letterhead and revised the FCE to "try to throw Texas Mutual off[,]" but TMIC still did not pay. (RR IV: 71).

Wells was also familiar with appellant's Marconi company, which was created to bill for FCEs. (RR IV: 37). Appellant instructed Wells not to bill TMIC under NTME. (RR IV: 38). Appellant wanted all FCEs that were done for TMIC to be billed under Marconi to see if they could get paid. (RR IV: 37). Wells believed that Marconi was created to "throw off" TMIC. (RR IV: 38-39).

Appellant had further instructed Shockley to call TMIC to discuss the denials with them. (RR IV: 72). Appellant told Shockley what to say, viz: that the doctors wanted the FCEs done and that in order to complete a DDE, the FCE was required. (RR IV: 71-72). Shockley spoke with Haden at TMIC about patient

Janet Stover and told Haden that Stover had completed all the steps of the FCE. But, Shockley was not telling the truth. (RR IV: 73). TMIC said the FCE reports were not accurate or truthful. (RR IV: 81).

Despite learning that NTME could only bill for face-to-face contact on an FCE, NTME did not change its billing practices. (RR IV: 85-86). Appellant knew that the FCEs that were submitted for payment were wrong and included physical tests that were never done. (RR IV: 87). Shockley even read the rule book regarding billing with appellant. (RR IV: 86).

Corroborating testimony from Wells, Shockley confirmed that FCEs were done at the NTME main office in Corinth. (RR IV: 74). Shockley actually saw patients enter the exam room for the FCEs, and she observed that the FCEs lasted 10 minutes at the most. (RR IV: 74). Patients typically spent five to ten minutes waiting for the doctor to arrive and do his designated-doctor report before the FCE. (RR IV: 75). Appellant's policy regarding FCEs was that one was to be done on each patient and the FCEs were to be billed at the maximum amount of 16 units "as if they were there for four hours." (RR IV: 75). Appellant told Shockley that the time spent talking with the patient, preparing the report, and sending out the report could be included in the 16 units. (RR IV: 75). But, it never took four hours to do all those activities. (RR IV: 75-76).

Shockley also testified that NTME paid for the rental of facilities for the FCEs and DDEs. (RR IV: 76). NTME rented the facilities for two hours at most. (RR IV: 76). NTME determined the times on the reports for the four-hour window for the FCEs based on the time NTME had rented the facility. (RR IV: 76). In other words, if NTME rented a facility from 8:00 a.m. to 10:00 a.m., they recorded the time on the FCE as "8:00-12:00" since it had to be four hours. (RR IV: 76). Appellant paid the designated doctors a certain amount for the DDEs, but he did not pay them for FCEs. (RR IV: 77).

Shockley confirmed that appellant created a template for the FCEs. (RR IV: 77). To complete the template for the FCE form, NTME merely copied and pasted a patient's name onto the form. (RR IV: 77). Shockley completed the FCE forms after the FCE, and it took her about ten minutes to do one report. (RR IV: 79). Appellant trained the technicians and paid them an incentive for doing FCEs. (RR IV: 77-78).

**TMIC's Investigation into Appellant for Fraud**

Haden began investigating appellant for fraud November 1, 2008, when data mining revealed suspicious patterns in his billing. (RR III: 56-57). The data mining showed that NTME always billed 16 units, the maximum allowable amount, for their FCEs. (RR III: 59). Further inquiry also revealed billings for overlapping times for one doctor, i.e., two patients having FCEs at the same time

21

when an FCE was a one-on-one service. (RR III: 60). From reviewing EES-14 forms related to appellant, Haden observed that many designated-doctor appointments fell within the middle of the time reported for the FCEs. (RR III: 62). Haden also reviewed the FCE reports and found that the reports were virtually identical except for the patient's name, date of injury, personal information and diagnosis code. (RR III: 63).

**Undercover Investigation of Appellant**

Haden then coordinated an undercover investigation of appellant. (RR III: 63). Bonita Reid[8] acted as the patient, and Regina Martinez acted as her sister and accompanied Reid on her appointments. (RR III: 64-65). G&S Staffing, one of TMIC's policyholders, was listed as Reid's employer. (RR III: 64). Medical bills generated under the investigation were to be submitted directly to the Special Investigations Department of the TMIC. (RR III: 67).

A TMIC adjuster also assisted in the investigation. (RR III: 66). For the undercover investigation, the adjuster requested a required medical examination on Reid acting as the injured worker. (RR III: 66). Reid had this required medical examination with Dr. Boudreau on March 9, 2009. (RR III: 199). Then, Reid had a second appointment for an FCE at a different location. (RR III: 199).

---

[8] Reid was a Senior Investigator for TMIC's Claimant Fraud Unit with 19 years' experience. (RR III: 197). Reid had previously been a Dallas police officer, working undercover in vice and narcotics, and an investigator for the Dallas County District Attorney's Office on death penalty cases. (RR III: 198).

22

William Muhr, a Senior Health Care Fraud Investigator for TMIC, conducted the second aspect of the undercover operation with Haden, Reid and Martinez on May 28, 2009, at a facility on Westheimer Road in Houston. (RR III: 66, 177, 181). Muhr had two types of recording devices; he gave a digital recording device to Reid and a radio frequency transmitter to Martinez. (RR III: 179, 182). State's exhibit 8, the recording of Reid's appointment, was admitted into evidence and played for the jury. (RR III: 183).

Reid arrived for her appointment at 12:58 p.m. and was called in for the appointment at 1:12 p.m. (RR III: 200). The examination took approximately 18 minutes.[9] (RR III: 202). State's exhibit 31 showed that Reid's FCE was billed at 16 units, meaning 4 hours. (RR III: 69-70; SX31). On a page entitled "North Texas Medical Evaluators," the FCE was reported as occurring from 3:00 p.m. to 7:00 p.m., with the same boilerplate language regarding tests and measurements that Haden found in all the reports. (RR III: 70).

Reid reviewed the billing submitted for her FCE (SX31), and testified that she did not arrive at 3 p.m. and leave at 7 p.m. as it reflected. (RR III: 202). Technician Jimenez testified that he did not spend from 3:00 p.m. to 7:00 p.m. on that FCE for Bonita Reid. (RR II: 99).

---

[9] On the recording, Reid stated "that only took 25 minutes," verbalizing that she had been at the appointment a very short time. (RR III: 202).

**Pecuniary Losses**

After this undercover operation, Muhr interviewed Dr. Boudreau and nine injured workers as part of his investigation. (RR III: 184-185). Once TMIC determined it had enough evidence, it denied all of NTME's bills for FCEs. (RR III: 113). Muhr also assisted in preparing SX5, the spreadsheet of the billings for the FCE patients that were paid by TMIC. (RR III: 185-186). Based on the results of their investigation, TMIC calculated the fraudulent payments based on either 2 units of credit or 4 units of credit for time spent with patients on FCEs. (RR III: 115). Based on TMIC's calculations for the 2 units, or 30 minutes, appellant was overpaid $71,416.42 in fraudulent amounts. (RR III: 103). Where TMICC gave appellant credit for spending 4 unit's time, or one hour, the damage in fraudulent payments was $61,214.07. (RR III: 104). If TMIC gave appellant no credit for time with patients on FCEs, the full 16 units (4 hours) fraudulently billed would have amounted to $81,618.75. (RR III: 104) The spreadsheet reflecting these calculations for each patient named in the indictment was admitted into evidence. (SX5; RR III: 100). Haden did not know the actual amount of time spent on FCEs for each patient in the indictment. (RR III: 116).

**Evidence from Appellant's Defensive Case-in-Chief**

Appellant presented evidence in his defense. On the State's cross-examination of Shelly Estrada, appellant's former office manager, Estrada testified

24

that she billed every one of appellant's FCEs at 16 units, i.e. the maximum time. (RR V: 144). Estrada believed that she could bill for time that was not spent face-to-face with the patient. (RR V: 147-148). Appellant told Estrada that she could calculate FCE time outside of the face-to-face contact with the patient. (RR V: 151).

## SUMMARY OF THE ARGUMENTS

*State's Reply to Appellant's First Point of Error*: In his first point of error, appellant challenges the legal sufficiency of the evidence on three elements of the offense, to-wit: intent to harm or defraud, deception, and jurisdictional value amount. He also contends that there was a variance between the State's pleading and proof. Viewing the evidence in the light most favorable to the verdict, a rational jury could have found the elements of securing execution of a document by deception beyond a reasonable doubt. Appellant's arguments are without merit.

Intent to defraud or harm, as used in Penal Code §32.46, is a question of fact to be determined from all the facts and circumstances. *Goldstein*, 803 S.W.2d at 791. Deception, as alleged in this case, meant creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true. Penal Code §§31.01, 32.46(d)(1).

The State presented overwhelming evidence that appellant created a false impression of fact in his creation and filing of fraudulent FCEs and form 1500s to obtain payment from TMIC. Appellant directed his employees to conduct an FCE on every patient and to submit bills to TMIC for 16 units' time (4 hours) for each patient, regardless of the time actually required to complete the FCE. The submitted 1500 forms also included billings for tests, measurements, and physical performances by patients that were not done. Appellant knew that his billing practices were improper and refused to change. When TMIC began to refuse payment to appellant's company NTME based on the fraudulent FCEs and 1500 forms, appellant created a new company, Marconi, in an effort to trick TMIC into for paying the fraudulent FCE claims. The State's evidence further showed that the value of TMIC's pecuniary interest affected by appellant's deception was $81,618.75 for the 16 units billed, $71,416.42 if TMIC gave appellant credit for 2 units, and $61,214.07 if TMIC gave appellant credit for 4 units of time for the FCEs. Under any scenario, the value of TMIC's affected pecuniary interest fell within the range for a third degree felony.

Finally, there was no variance between the State's pleading and proof at trial. The State alleged in the indictment that appellant submitted an HCFA 1500, but the documentation admitted into evidence at trial was labelled CMS 1500. Evidence from multiple witnesses established that the CMS 1500 was the more

26

modern version of the HCFA 1500, and the name of the form changed when the Health Care Finance Administration changed its name to the Center for Medicaid and Medicare Services. Nevertheless, persons in the industry commonly referred to the CMS 1500 as the HCFA, and witnesses at trial used the terms interchangeably to refer to the same document. Additionally, exhibits admitted at trial showed that appellant's employees referred to the submitted health insurance claim form as the HCFA 1500. Thus, the State's pleading did not vary from its proof.

Appellant's legal insufficiency arguments are without merit and should be overruled.

*State's Reply to Appellant's Second Point of Error:* Appellant failed to preserve any alleged error for review, as his argument on appeal does not comport with his objection at trial. Additionally, appellant did not object at trial to the timeliness of the State's disclosure of the information that the TMIC funded the Workers' Comp Fraud Unit of the District Attorney's Office. Finally, the trial court did not err in excluding evidence of that funding, as the trial judge did not abuse his discretion in determining that that evidence was not relevant to any issue in this cause, viz: whether appellant committed securing execution of a document by deception. Appellant's second point of error has no merit.

**STATE'S REPLY TO APPELLANT'S FIRST POINT OF ERROR**

**The evidence was legally sufficient to establish beyond a reasonable doubt that appellant committed securing execution of a document by deception as alleged in the indictment.**

**Standard of Review**

In determining whether the evidence is sufficient to support a conviction, an appellate court must review the evidence in the light most favorable to the verdict by asking whether any rational trier of fact could have found the appellant guilty of the elements of the crime beyond a reasonable doubt. *McCain v. State*, 22 S.W.3d 497, 503 (Tex.Crim.App. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)). This familiar standard gives full play to the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Jackson v. Virginia,* 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007).

While evidence presented at trial may offer conflicting accounts, the introduction of conflicting evidence is not enough to render the evidence insufficient as a whole. *Turro v. State*, 867 S.W.2d 43, 47 (Tex.Crim.App. 1993). It is within the province of the jury, as fact-finder, to judge the weight and

credibility to be accorded witness testimony, and the appellate court must defer to the jury's determination concerning what weight to give contradictory testimonial evidence. *See Cain v. State,* 958 S.W.2d 404, 408-09 (Tex.Crim.App. 1997); *Bowden v. State,* 628 S.W.2d 782, 784 (Tex.Crim.App. 1982). The trier of fact, not the appellate court, determines whether to accept or reject any or all of a witness's testimony. *Adelman v. State,* 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); *Matson v. State,* 819 S.W.2d 839, 843 (Tex.Crim.App. 1991). The appellate court's duty is to determine if both the explicit and implicit findings of the trier of fact are rational by viewing all of the evidence admitted at trial in the light most favorable to the verdict. *Adelman,* 828 S.W.2d at 422. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. *Matson,* 819 S.W.2d at 843.

## 1. Intent to Defraud or Harm

Mental states are almost always inferred from acts and words. *Hill v. State*, 161 S.W.3d 771, 775 (Tex.App. – Beaumont 2005, no pet.), citing *Moore v. State*, 969 S.W.2d 4, 10 (Tex.Crim.App. 1998). The courts have long recognized that mental culpability is of such a nature that it generally must be inferred from the circumstances under which the prohibited act occurred. *Dillon v. State*, 574 S.W.2d 92, 94 (Tex.Crim.App. 1978); *Russo v. State*, 228 S.W.3d 779, 793 (Tex.App. – Austin 2007, pet.ref'd.). A culpable mental state may be inferred by the trier of fact from the acts, words, and conduct of the accused. *Dues v. State*,

29

634 S.W.2d 304, 306 (Tex.Crim.App. 1982); *Barnes v. State*, 62 S.W.3d 288, 298 (Tex.App. – Austin 2001, pet.ref'd.). Indeed, the Court of Criminal Appeals stated long ago that a defendant's mental state is "concealed within his own mind and can only be determined from his words, acts, and conduct." *Moore*, 969 S.W.2d at 10 (quoting *Norwood v. State*, 135 Tex. Crim. 406, 120 S.W.2d 806, 809 (Tex.Crim.App. 1938). "Intent to defraud and harm" as used in Penal Code §32.46 is a question of fact to be determined from all the facts and circumstances. *Goldstein v. State*, 803 S.W.2d 771, 791 (Tex.App. – Dallas 1991, pet.ref'd.), citing *Willbur v. State*, 729 S.W.2d 359, 361 (Tex.App. – Beaumont 1987, no pet.).

The State alleged, in relevant part, in the indictment that appellant acted with intent to defraud and harm the Texas Mutual Insurance Company. (CR 12). The Penal Code does not define "defraud." In that situation, the appellate courts give the word its "plain meaning unless the statute clearly shows that [it was] used in some other sense." *In re E.P.*, 185 S.W.3d 908, 910 (Tex. App. - Austin 2006, no pet.). The appellate court looks to the dictionary or other similar sources to determine the word's definition. *See Oler v. State*, 998 S.W.2d 363, 368 (Tex. App. - Dallas 1999, pet.ref'd., untimely filed). According to merriam-webster.com/dictionary, "defraud" means to trick or cheat someone or something in order to get money or use fraud in order to get money from a person, an organization, etc. *See also Margraves v. State*, 34 S.W.3d 912, 923

30

(Tex.Crim.App. 2000) (Johnson, J., concurring) (thesaurus gives the synonyms of dupe, swindle, cheat, or deceive). "Harm" is defined by the Penal Code as "anything reasonably regarded as loss, disadvantage, or injury, including harm to another person in whose welfare the person affected is interested." V.T.C.A. Penal Code §1.07(a)(25).

The State presented substantial evidence from which a rational jury could infer beyond a reasonable doubt that appellant acted with the intent to harm and defraud the TMIC. Testimony established that appellant directed his employees to bill for 16 units or 4 hours for each FCE and that he required an FCE on every patient. Yet, Dr. Boudreau and appellant's medical technicians all testified that they had never conducted an FCE that lasted as long as 4 hours. Testimony from Dockray and Ettinger, two employees injured on their jobs, established that their FCEs lasted less than one hour each, but both FCEs were billed at 4 hours. Jackson, another patient, confirmed that her FCE did not last 4 hours, even though appellant submitted paperwork reflecting that it did. The undercover investigation revealed that appellant billed for 4 hours for the FCE with Bonita Reid, which in reality lasted only 18 minutes.

Additional evidence showed that appellant rented facilities for FCEs for only two to three hours at most, yet he billed for 20 hours of FCEs each day. Appellant calculated the 4-hour timeframe on the FCEs based on the time a facility was

31

rented, i.e. if a facility were rented from 8 a.m. to 10 a.m. for FCEs, appellant recorded the time for an FCE as 8 a.m. to 12 p.m. Appellant's billing documents also reflected multiple FCEs being conducted simultaneously, which was not permissible as billing for an FCE under CPT code 97750 required one-on-one patient contact.

Furthermore, evidence showed that appellant knew his billing practices were wrong, but he refused to change them. Shockley confirmed that appellant knew that the FCEs that were submitted for payment were wrong and included physical tests that were never done. Appellant instructed Shockley to call TMIC regarding the denied payments to NTME and told her what to say, viz: that the FCEs were required as part of the DDE. When TMIC refused to pay, appellant created another company, Marconi, under which to bill for TMIC patients in an attempt to "throw off" TMIC and "trick" them into paying, according to appellant's employees.

From this evidence, the jury could infer appellant acted with intent to defraud and/or harm TMIC.

Appellant contends the evidence is legally insufficient to support the *mens rea* element because he presented evidence that he believed he had actually rendered 16 units of compensable time. Appellant's argument lacks merit because any inconsistencies in the evidence are resolved in favor of the verdict. *Matson,*

32

819 S.W.2d at 843. It was the jury's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Jackson v. Virginia,* 443 U.S. at 319. The jury's determination that appellant acted with intent to defraud and/or harm TMIC was supported by overwhelming evidence of appellant's known and repeated improprieties in his billing for FCEs. Therefore, the evidence was legally sufficient.

## 2. Deception

Penal Code §32.46 was intended to proscribe conduct that is deceptive. *Mills v. State*, 722 S.W.2d 411, 416 (Tex.Crim.App. 1986). Pursuant to §32.46(d)(1), "deception" has the meaning assigned by V.T.C.A. Penal Code §31.01. That section provides, in relevant part, that "deception" means (A) "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true."

The State alleged in relevant part in the indictment that appellant, by deception, created and confirmed by words and conduct a false impression of fact by causing an HCFA Form 1500 to be submitted to TMIC for payment of services under CPT code 97750 for 16 units of service that were not rendered on multiple persons listed in the indictment. (CR 12-18). Appellant contends that the State

failed to establish that TMIC would not have executed the documents at issue *but for* appellant's actions and that, therefore, the evidence is legally insufficient.

Testimony from medical billing expert Luevano established that an HCFA 1500, also known as a CMS 1500, was a paper billing form used to bill for professional services. The Form 1500 was prepared by the healthcare provider and submitted to the insurance company for payment. The insurance carrier determined what to pay the healthcare provider based on the information in that form. FCEs were billed via a Form 1500 under CPT code 97750. Thus, it was the filing of that claim form that initiated the payment to the healthcare provider.

Overwhelming evidence in this case established that appellant created a false impression of fact in his creation and filing of fraudulent FCEs and form 1500s to obtain payment from TMIC. Appellant created a template for the FCEs, and, to complete the template, NTME employees merely copied and pasted a patient's name onto the form. The FCEs from appellant included the same language regarding physical tests and examinations performed during the FCEs, but this information was false, as those tests and examinations were never done. Appellant billed all FCEs at 16 units of time, although no single FCE took that much time. Furthermore, after TMIC discovered appellant's fraudulent billing practices and refused to pay on the FCEs, appellant created a new company called Marconi Physical Performance Testing to dupe TMIC into paying for the FCEs.

A person causes the execution of a document if the victim would not have executed that document but for the actions of the defendant. *Goldstein*, 803 S.W.2d at 7911. The evidence showed that appellant directed his employees to bill 4 hours for each FCE. His employees submitted these bills based on his directive, and TMIC executed checks based on those bills. Viewing all the evidence in the light most favorable to the verdict, a rational trier of fact could have concluded beyond a reasonable doubt that appellant, by deception, caused TMIC to pay for numerous FCEs based on fraudulently created claim forms.

### 3. Jurisdictional Amount of Pecuniary Loss

Appellant next contends that the State failed to present legally sufficient evidence to support this third degree felony because the State should have segregated the value of the properly billed FCEs from the value of the fraudulently billed FCE services. Appellant's brief at p. 13.[10]

Under Penal Code §32.46, a person commits an offense if, with intent to defraud or harm any person, he, by deception, causes another to execute any document affecting the pecuniary interest of any person. An offense under this section is a third degree felony if the value of the pecuniary interest is $20,000 or more but less than $100,000. The term "pecuniary interest" is not defined by the

---

[10] This Court rejected this same argument in affirming appellant's prior conviction in *Douglas v. State*, No. 03-13-00092-CR, delivered August 26, 2015 (memorandum opinion), pp. 11-12.

statute; therefore, courts have defined the term using its common meaning of having a "financial stake" in a matter. *See Bennett v. Grant*, 460 S.W.3d 220, 243 (Tex.App. - Austin 2015, pet. filed), citing *Briones v. State*, 76 S.W.3d 591, 595 (Tex. App. - Corpus Christi 2002, no pet.); *Goldstein*, 803 S.W.2d at 791.

The State submits that it was not required to segregate the false amounts from the amounts that might be deemed legitimate. The evidence showed that TMIC was defrauded into paying NTME based upon falsified form requests, viz: the health insurance claim forms billing for 16 units for FCEs. That a portion of that payment may have been legitimate did not render valid the claim for the full 16 units. Thus, each claim submitted on behalf of appellant by NTME contained false information. The State proved that the pecuniary value of the payments made by TMIC to NTME based on the fraudulent claims for 16 units was $81,618.75. Thus, the evidence was legally sufficient to prove that the value of TMIC's affected pecuniary interest was within the range of a third degree felony.

Nevertheless, TMIC calculated its pecuniary losses based on giving appellant credit for 2 units of service and 4 units service. Based on 2 units, appellant was overpaid $71,416.42 in fraudulent amounts, and based on 4 units, appellant was overpaid $61,214.07 in fraudulent amounts. Thus, even with the allegedly legitimate amounts segregated from the fraudulent amounts, the value of

36

TMIC's affected pecuniary interest still fell within the range for a third degree felony. Appellant's claim is wholly without merit.

### 4.  No Variance Between the Pleading and Proof

A "variance" occurs when there is a discrepancy between the allegations in the charging instrument and the proof at trial. *Gollihar v. State*, 46 S.W.3d 243, 246 (Tex.Crim.App. 2001). In a variance situation, the State has proven the defendant guilty of a crime, but has proven its commission in a manner that varies from the allegations in the charging instrument. *Id.* Appellant contends the evidence established that the actual form submitted by NTME to TMIC for payment was a CFS form, not an HCFA 1500 form as pled in the indictment. Appellant's brief at p. 22.

The State addressed this issue at trial. Luevano explained that HCFA was the acronym for the Centers for Medicare and Medicaid Services before it took that name. The CMS 1500 form was the more modern version of the HCFA 1500; both were the paper billing form used nationally by medical providers to bill for their services. Luevano used the two terms interchangeably in her testimony. Furthermore, Haden identified SX30 as an HCFA 1500, even though technically it was a CMS 1500 form, as labelled in the bottom right-hand corner. Haden noted that the claim form used to be a HCFA Form 1500 but the name of the form changed to CMS 1500 when the Centers for Medicare and Medicaid took over for

the Health Care Finance Administration.  The term HCFA was commonly used in the industry to refer to the CMS 1500.

Significantly, the documents used by NTME in their billing for the FCEs showed that NTME in fact referred to the CMS 1500 form as an "HCFA."  State's exhibit 29 contained the claim forms and billing documents for the FCE done on Barbara Boles.  Within SX29 is a facsimile cover sheet for a corrected FCE claim.  This cover sheet, from Tamara Wells, reflected that NTME was submitting a "corrected HCFA."  (RR 12: 179; SX29).  This "corrected HCFA" was in reference to the original submitted claim form, a CMS 1500.  And, in SX36, the facsimile cover sheet shows that an "HCFA 1500" in included in the fax, when the document used is actually labelled "CMS 1500."  (RR XII: 225; SX36).

Finally, the State notes that the claim form bears only the designation "1500" at the top of the document.  Whether called an HCFA 1500 or a CMS 1500, it was the same form, viz, a health insurance claim form.  The evidence showed that the witnesses considered the forms to be the same thing.  Thus, there was no variance between the State's pleading and its proof.

Appellant's legal insufficiency claims are without merit, and his first point of error should be overruled in its entirety.

### State's Reply to Appellant's Second Point of Error

**Appellant failed to preserve any alleged error for review, as his claim on appeal differs from his trial objection. Alternatively, the trial judge did not abuse his discretion in excluding irrelevant evidence of TMIC's funding of the Workers' Compensation Fraud Unit.**

### Statement of Facts

Donna Crosby, one of the prosecutors in this case, testified that she had worked at the District Attorney's Office since 1990, the majority of that time in the Public Integrity Unit. (RR V: 60). Crosby informed appellant that TMIC provided some funding for her division at the DA's Office. (RR V: 60-61). Crosby testified that TMIC paid for the Workers' Comp Fraud Unit and had done so since its inception, approximately 14 years ago. (RR V: 61, 68). The Unit consisted of two attorneys and a paralegal. (RR V: 62). Crosby did not know how much money TMIC provided. (RR V: 63).

Crosby had prosecuted Workers' Comp fraud cases that involved an insurance carrier other than TMIC in the past and planned to do so in the future. (RR V: 64-65). Crosby did not spend 100% of her time prosecuting cases involving TMIC. (RR V: 65). But, when she prosecuted workers' compensation fraud cases, TMIC was always an alleged victim. (RR V: 67). Crosby always prosecuted cases involving TMIC in Travis County. (RR V: 68). She presented her cases to the Grand Jury. (RR V: 70).

The fact that the unit received funding from TMIC did not affect Crosby's decision on which cases to prosecute or how to handle them. (RR V: 69). In that regard, the DA's Office maintained its autonomy. (RR V: 69). Crosby listened to TMIC's recommendations and opinions, but the ultimate decision on who to prosecute remained within her discretion as a prosecutor. (RR V: 69-70).

Appellant contended Crosby's testimony should be admissible before the jury because it was relevant and exculpatory as motivation for this lawsuit. (RR V: 71). Crosby contended her testimony was irrelevant, and the trial judge commented that it was certainly not exculpatory. (RR V: 71). Appellant vacillated on whether Crosby's testimony was exculpatory, but he was steadfast in his contention that it was relevant. (RR V: 71). The trial judge did not consider the evidence relevant to whether appellant committed the crime alleged in the indictment. (RR V: 77-78).

The trial judge also noted that appellant's argument suggested that this was a malicious prosecution, which would allow the State to rebut that allegation with proof of appellant's prior conviction for the same crime with a different company he had. (RR V: 80). The trial judge also believed the appellant's proffered evidence would be excludable under Tex.R.Evid. 403. (RR V: 81). Therefore, the trial judge did not allow appellant to call Crosby as a witness before the jury. (RR V: 81).

Despite his issue with the relevancy of the proffered testimony, the trial judge suggested appellant could attempt to present the evidence through another witness. (RR V: 81). Ultimately, though, the trial judge ruled that the proffered evidence of the funding by TMIC of the District Attorney Office's Workers' Comp Fraud Unit was not relevant, and, if it were, Rule 403 required its exclusion. (RR V: 83).

**Preservation of Error**

To preserve error for appellate review the complaining party must make a timely objection specifying the grounds for the objection if the grounds are not apparent from the context. Tex.R.App.Proc. 33.1. Additionally, to preserve error, the complaining party must obtain an adverse ruling from the trial court, and the issue on appeal must correspond to the objection made at trial. *See* Tex.R.App.Proc. 33.1; *Wilson v. State*, 71 S.W.3d 346, 349 (Tex.Crim.App. 2002).

In this point of error, appellant contends the trial judge erred in not allowing him to present evidence that TMIC funded the Workers' Comp Fraud Unit of the District Attorney's Office. In his brief, appellant argues that American Bar Association ethical standards prohibiting conflicts of interest between the State and an alleged victim rendered this evidence relevant in this case. But, appellant did not make that argument in the trial court. Appellant therefore presents no alleged error for review because his argument on appeal differs from his objection in the

41

trial court. Tex.R.App.Proc. 33.1; *Rezac v. State*, 782 S.W.2d 869 (Tex.Crim.App. 1990) (where the objection at trial differs from the argument on appeal, no error is presented for appellate review).

Appellant also complains in his brief of the timeliness of the State's disclosure of the funding by TMIC, but he does not present an appellate issue regarding it. And, appellant did not object to the timeliness of the disclosure in the trial court, so no alleged error is preserved for review. Tex.R.App.Proc. 33.1.

**Standard of Review and Application of Law to Fact**

An appellate court reviews the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Green v. State*, 934 S.W.2d 92, 101-102 (Tex.Crim.App. 1996), *cert.denied*, 520 U.S. 1200 (1997). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Montgomery*, 810 S.W.2d 372, 380 (Tex.Crim.App. 1991). "The mere fact that a trial judge may decide a matter within its discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred." *Rogers v. State*, 111 S.W.3d 236, 243 (Tex.App. – Texarkana 2003, no pet.), quoting *Montgomery*, 810 S.W.2d at 380.

Under these guiding principles of law, the trial judge did not abuse his discretion in excluding the evidence that TMIC provided funding for the Workers'

Comp Fraud Unit. The record reflects that trial judge heard testimony, considered the arguments of counsel, and determined that the proffered testimony was not relevant to any fact of consequence in this trial, viz: whether appellant committed the charged crime.

Appellant contends the evidence was relevant because the jury could have inferred that the DA's Office acted as the "personal attorneys for TMIC" and that "such a revelation" would have complemented his defensive theory that TMIC was "strong-arming" appellant because it didn't want to compensate him for the full 16 units. Appellant's brief at p. 36. Appellant's arguments are without merit, as there was no evidence that the prosecutors acted as attorneys for TMIC. Crosby established that she worked for the DA's Office, not TMIC, that she maintained her prosecutorial discretion over all TMIC cases and had the final decision on which cases were prosecuted, and that the grand jury indicted these fraud cases. It was not a reasonable inference that the prosecutors were the personal attorneys for TMIC. Additionally, as the trial judge noted, if appellant presented this proffered testimony in support of his strong-arming defensive theory, he opened the door to evidence of his prior conviction for the same type of fraud.[11] Finally, the State notes that, regardless of the trial court's ruling excluding his proffered evidence,

---

[11] This Court recently affirmed that conviction. *Douglas v. State*, No. 03-13-00092-CR, delivered August 26, 2015 (memorandum opinion).

43

appellant argued to the jury that this prosecution was motivated by the relationship between TMIC and the District Attorney's Office. *See* (RR VI: 22, 31).

The trial judge did not abuse his discretion in excluding appellant's proffered evidence. Appellant's second point of error is without merit and should be overruled.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the State prays this Court to overrule the appellant's points of error and to affirm the trial court's judgment.

Respectfully submitted,

ROSEMARY LEHMBERG
District Attorney
Travis County, Texas


*/s/ Lisa Stewart*
Lisa Stewart
Assistant District Attorney
State Bar No. 06022700
P.O. Box 1748
Austin, Texas 78767
Lisa.Stewart@traviscountytx.gov
AppellateTCDA@traviscountytx.gov
(512) 854-9400
Fax No. 854-4810

**CERTIFICATE OF COMPLIANCE**

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(2)(A), the State certifies that the length of this brief is 9,457 words. The State also certifies, pursuant to Texas Rule of Appellate Procedure 9.4(e), a conventional typeface 14-point was used to generate this brief.

> */s/ Lisa Stewart*
> Lisa Stewart
> Assistant District Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that, on the 28th day of August, 2015, a true and correct copy of this brief was served, by U.S. mail, electronic mail, facsimile, or electronically through the electronic filing manager, to the Appellant's attorney, Craig M. Price, Hammerle Finley Law Firm, 2871 Lake Vista Drive, Suite 150, Lewisville, Texas 75067, cmp@hammerle.com.

> */s/ Lisa Stewart*
> Lisa Stewart
> Assistant District Attorney