In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-03-583 CR


____________________



MICHAEL LEE HILL, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 258th District Court


Polk County, Texas


Trial Cause No. 17,206






OPINION


 Following a bench-trial, appellant was convicted of the offense of "Possession or
Transport of Certain Chemicals With Intent to Manufacture Controlled Substance." See
Tex. Health & Safety Code Ann. § 481.124 (Vernon Supp. 2003). (1) The trial court
assessed punishment at confinement in the Texas Department of Criminal Justice -
Correctional Institutions Division for a term of ten years, with an added fine of $1,500. 
The trial court suspended imposition of the sentence and placed appellant on community
supervision for a period of ten years. Appellant presents two issues for our consideration,
viz: 


 The trial court erred in refusing to set aside the indictment against
Appellant in that the indictment failed to allege an offense.

 The evidence is legally insufficient to sustain Appellant's conviction
in that there is no evidence that Appellant possessed ephedrine or
pseudoephedrine in a form subject to regulation under the Health and
Safety Code with the intent to manufacture methamphetamines.



 At the outset, we acknowledge appellant's waiver of his first issue during oral
argument, conceding that the indictment did indeed allege an offense. However, as is
evident by the framing of his second issue, an examination of the statute and how he was
alleged to have violated it are in order prior to addressing the legal sufficiency of the trial
evidence. (2) 

 The statutory provision appellant was convicted of violating reads, in pertinent part,
as follows:

 (a) A person commits an offense if, with intent to unlawfully manufacture a
controlled substance, the person possesses or transports:


 . . . .


 (3) a chemical substance subject to regulation under Section 481.077. 


See sec. 481.124(a)(3). The indictment alleges that on or about February 19, 2003,
appellant "did then and there with intent to unlawfully manufacture a controlled substance,
namely: Methamphetamine possess or transport a chemical substance, to-wit: a product
containing ephedrine or pseudoephedrine, . . ." 

 Generally, an indictment is deemed sufficient when it charges the commission of the
offense in ordinary and concise language in such a manner as to enable a person of common
understanding to know what is meant, and with that degree of certainty that will give the
defendant notice of the particular offense with which he is charged, and enable the court,
on conviction, to pronounce the proper judgment. See Tex. Const. art. V, § 12; Tex.
Code Crim. Proc. Ann. art. 21.11 (Vernon 1989); Duron v. State, 956 S.W.2d 547, 550-51 (Tex. Crim. App. 1997). Furthermore, an indictment meeting the constitutional and
statutory mandates is not rendered void even if it omits an essential element of a criminal
offense or includes information that may indicate innocence. Duron, 956 S.W.2d at 550-51; Studer v. State, 799 S.W.2d 263, 272 (Tex. Crim. App. 1990). "An indictment for an
act done with intent to commit some other offense may charge in general terms the
commission of such act with intent to commit such other offense." Tex. Code Crim.
Proc. Ann. art. 21.13 (Vernon 1989). In the instant case, rather than merely tracking the
general language of section 481.124, the State provided greater particularity in specifying
the "chemical substance" ("ephedrine or pseudoephedrine") appellant was possessing or
transporting, and specified the particular controlled substance ("Methamphetamine")
appellant was intending to manufacture at the time he was possessing or transporting the
"ephedrine or pseudoephedrine." 

 As we appreciate the crux of appellant's position at trial and on appeal, he contends
that the two chemical substances alleged, "ephedrine or pseudoephedrine," are not "subject
to regulation under Section 481.077," "in the form actually possessed by Appellant." As
foundation for this contention, appellant refers us to the language contained in section
481.077 of the Health and Safety Code. (3) See Tex. Health & Safety Code Ann. §
481.077 (Vernon Supp. 2003). Entitled "Chemical Precursor Records and Reports," the
pertinent portions of section 481.077 read as follows:

 (a) Except as provided by Subsection (l), a person who sells, transfers, or
otherwise furnishes a chemical precursor to another person shall make an
accurate and legible record of the transaction and maintain the record for at
least two years after the date of the transaction.


 . . . .


 (l) This section does not apply to the sale or transfer of a nonnarcotic product
that includes a chemical precursor subject to Subsection (a) if the sale or
transfer complies with federal law and involves a product that may be sold
lawfully with a prescription or over the counter without a prescription under
the Federal Food, Drug, and Cosmetic Act (21 U.S.C. Section 301 et seq.)
or a rule adopted under that Act. 


 It is undisputed that at the time of the offense, the Health and Safety Code defined
"Chemical precursor" to include both ephedrine and pseudoephedrine. See Tex. Health
& Safety Code Ann. § 481.002(51)(N) & (O) (Vernon Supp. 2005). (4) It is also undisputed
that the "ephedrine or pseudoephedrine" appellant was charged with possessing or
transporting appears to have been obtained during a routine retail purchase of over-the-counter sinus/allergy medication. 

 Under our statutory construction standards, we are to use the plain language of the
statute unless the language is ambiguous or would produce absurd results. See Bluitt v.
State, 137 S.W.3d 51, 54 (Tex. Crim. App. 2004); Boykin v. State, 818 S.W.2d 782, 785
(Tex. Crim. App. 1991). Read in its entirety, section 481.124 has as its sole purpose the
criminalizing of specified conduct. Except for having been enacted as part of the Texas
Health and Safety Code, the language of section 481.124 meets the general objectives of
provisions contained in the Texas Penal Code, viz: "to establish a system of prohibitions,
penalties, and correctional measures to deal with conduct that unjustifiably and inexcusably
causes or threatens harm to those individual or public interests for which state protection
is appropriate." See Tex. Pen. Code Ann. § 1.02 (Vernon 2003).

 On the other hand, a plain reading of section 481.077 in its entirety indicates that it
is an administrative "tool" in that it requires certain sellers or transferors of chemical
precursors to make and retain accurate and legible records of certain types of sales or
transactions to certain types of buyers or recipients. Section 481.077 does not either
exclude or exempt any of the chemical precursors listed under section 481.002(51). It does,
however, excuse from its otherwise rigorous record-keeping requirements "retail-sale"-type
transfers of nonnarcotic or prescription products, approved and released for marketing to
the general public under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et
seq.), containing chemical precursors. See section 481.077(l). Therefore, all chemical
precursors, including ephedrine and pseudoephedrine, continue to be "a chemical substance
subject to regulation under Section 481.077," regardless of their weights or concentrations. 
What section 481.077 does not "regulate," i.e., "does not require to be performed" is the
extensive record-keeping/licensing/reporting of retail, consumer-type sales of nonnarcotic
or prescription products released for sale to the public under the guidelines of the Federal
Food, Drug, and Cosmetic Act. 

 The essence of appellant's contention is that because the pseudoephedrine he
possessed when stopped and arrested was contained in "over-the-counter cold tablets" in
a form "not subject to regulation under Section 481.077," there was no evidence that
appellant possessed or transported any item prohibited by section 481.124(a)(3). Appellant
fails to consider the plain language of section 481.077 as primarily a record-keeping "tool"
of state government. Indeed, by its very title, the scope of section 481.077's regulatory
function centers on "Chemical Precursor Records and Reports." All chemical precursors
are generally subject to its regulatory reach. Designated records and reports of chemical
precursor sales or transactions must be created and maintained, with the only exception
being those sales or transactions of chemical precursors described under subsection (l). The
mere fact that appellant's possession of the chemical precursor pseudoephedrine was in a
"form" that did not require any of the clerks at any of the retail stores to create and
maintain a record for purposes of section 481.077 does not mean that the same
pseudoephedrine was not "a chemical substance subject to regulation under Section
481.077." As the State argued to the trial court at the conclusion of the pretrial hearing on
the motion to set aside the indictment: 

 [Section 481.077] does not say, as [Trial Counsel] is suggesting, that
ephedrine and pseudoephedrine is not a substance subject to regulation under
this statute. In fact, if you - - if it is a transaction that is outside the scope of
this exception [481.077(l)] here, it is absolutely subject to the reporting and
record keeping requirements of the statute. But if you look back over here
under 481.124, it's not the transaction that is the offense at issue. It is the
possession of the substance that is with the intent to manufacture
methamphetamines [sic] that is the criminal offense. 

 I'm not prosecuting Wal-Mart for selling this ephedrine or
pseudoephedrine. I'm not prosecuting this Defendant for participating in that
transaction. I'm not even prosecuting him for possession of ephedrine or
pseudoephedrine. I mean, any of us that buy cold medication would be guilty
of that offense if that's all you had to do is possess this. I am prosecuting
him for possession of those substances with the intent to manufacture
methamphetamines [sic].


 Having decided that appellant's indictment does sufficiently charge him with a
criminal offense, we move to the issue of legal sufficiency of the trial evidence. In
reviewing the trial evidence for legal sufficiency, we view said evidence in the light most
favorable to the verdict so as to determine whether any rational trier of fact could have
found each of the essential elements proven beyond a reasonable doubt. Jackson v.
Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Conner v. State, 67
S.W.3d 192, 197 (Tex. Crim. App. 2001). When conducting a sufficiency review, "we
consider all the evidence admitted, whether proper or improper." Conner, 67 S.W.3d at
197; Garcia v. State, 919 S.W.2d 370, 378 (Tex. Crim. App. 1994). Every fact need not
point directly and independently to the defendant's guilt. See Conner, 67 S.W.3d at 197. 
A conclusion of guilt can rest on the combined and cumulative force of all incriminating
circumstances. Id. In a bench trial, the trial court, as finder of fact, may resolve any
conflicts in the evidence, evaluate the credibility of the witnesses, and determine the weight
to be given any particular evidence. See Joseph v. State, 897 S.W.2d 374, 376 (Tex. Crim.
App. 1995); Winkley v. State, 123 S.W.3d 707, 711 (Tex. App.--Austin 2003, no pet.).

 Mental states are almost always inferred from acts and words. See Moore v. State,
969 S.W.2d 4, 10 (Tex. Crim. App. 1998). "'Mental culpability is of such a nature that
it generally must be inferred from the circumstances under which a prohibited act or
omission occurs.'" Id. (quoting Hernandez v. State, 819 S.W.2d 806, 810 (Tex. Crim.
App. 1991)). A defendant's mental state is "'concealed within his own mind and can only
be determined from his words, acts, and conduct.'" Id. (quoting Norwood v. State, 135
Tex. Crim. 406, 120 S.W.2d 806, 809 (1938)). Culpable mental state is most commonly
grounded upon inferences to be drawn by the factfinder from the attendant circumstances. 
See Lane v. State, 763 S.W.2d 785, 787 (Tex. Crim. App. 1989). Thus, the factfinder may
infer intent or knowledge from any facts in evidence that tend to prove the existence of such
a culpable mental state. See Hernandez, 819 S.W.2d at 810. For example, while flight
alone is not dispositive of guilt, evidence of flight by a defendant is a circumstance from
which an inference of guilt may be drawn by the factfinder. See Foster v. State, 779
S.W.2d 845, 859 (Tex. Crim. App. 1989); Valdez v. State, 623 S.W.2d 317, 321 (Tex.
Crim. App. 1979) (op. on reh'g). 

 In the instant case, the testimony indicated that on February 19, 2003, Detective Matt
Parrish of the Livingston Police Department received information from an employee of the
local Wal-Mart that two subjects had purchased "Sudafed" and matches. After leaving
Wal-Mart, the two subjects, later identified as appellant and his cousin, Scott Watson, were
further observed by the employee driving away in a grey, older-model vehicle. Parrish was
also provided with the license plate number of the vehicle. Parrish concluded the phone call
and, while processing the information, then received another call from the Wal-Mart
employee informing him that appellant and Watson had returned and were purchasing
additional matches, Coleman fuel, and other similar items. Parrish testified that he had
been provided similar information in the past from Wal-Mart employees involving other
individuals making purchases of "quantities" of "Sudafed" or "ephedrine type"
medications. 

 Believing appellant and Watson would purchase additional items similar to those
purchased at Wal-Mart, Parrish proceeded to patrol local store parking lots in an unmarked
police unit. Parrish located the grey vehicle in the parking lot of "Bill's Dollar Store," in
Livingston. At that point, Parrish was in communication with Officer Leon Middleton, also
of the Livingston Police Department. Officer Middleton was in an unmarked, personal
vehicle. Parrish and Middleton parked and observed appellant and Watson leave the dollar
store, drive a short distance, and enter "O'Reilly's" store. Although the grey vehicle was
not registered to appellant, he was the one driving the vehicle. Appellant and Watson
eventually left "O'Reilly's" and proceeded to drive away, with Parrish and Middleton
following. At this point, because the grey vehicle appellant was driving had no front
license plate, Parrish summoned assistance from a marked police unit. 

 Parrish next observed the grey vehicle enter the "H-E-B" parking lot and then
proceed to exit the parking lot at a high rate of speed onto the access-road of Highway 59,
take the turnaround, and proceed to travel southbound onto Highway 59. Parrish pursued
in his unmarked unit, but appellant's vehicle sped almost "out of sight." Parrish saw
appellant's vehicle eventually take an exit onto FM 1988. Parrish continued the pursuit
onto FM 1988 and estimated appellant's speed at that point to be between "80 or 90" miles
per hour. Parrish eventually caught up to appellant's vehicle and activated his emergency
lights and siren. By that time a marked Livingston Police unit had arrived at the scene. 
Appellant finally stopped his vehicle, at which point the officers were able to identify both
men. 

 After identifying himself and explaining the reason for the traffic stop, Parrish asked
for, and was given, consent by appellant to search the vehicle. Inside the grey vehicle,
Parrish observed "personal walkie-talkies," and a vehicle-to-vehicle scanner that was later
found to belong to the Camilla Fire Department. (5) The scanner was in working condition
and appeared to be tuned into the same frequency that was being used by Parrish and other
law enforcement officers to communicate among the various police units. The following
items introduced by the State were found in the vehicle appellant was operating at the time
of his arrest: 

 State's Exhibit No. 1 - A funnel,

 State's Exhibit No. 2 - Coleman fuel,

 State's Exhibit No. 3 - A one-gallon container which was filled with water at
the time of appellant's arrest,

 State's Exhibit No. 4 - "Cobra" hand-held, personal walkie-talkie,

 State's Exhibit No. 5 - A container of "Heet," which was described as a gas-line antifreeze and water remover,

 State's Exhibit No. 6 - Electrical tape,

 State's Exhibit No. 7 - A container of Heet,

 State's Exhibit No. 8 - Electrical tape, 

 State's Exhibit No. 9 - Batteries,

 State's Exhibit No. 10 - Nasal decongestants for cold or allergies containing
pseudoephedrine,

 State's Exhibit No. 11 - Box cutter/razor blade scraper,

 State's Exhibit No. 12 - Box of "Actifed, 24 tablets," containing
pseudoephedrine, 

 State's Exhibits Nos. 13, 14, 15, 16, 17 - Blister packs of "Actifed,"
containing pseudoephedrine, 

 State's Exhibit No. 18 - Individual sandwich baggies, 

 State's Exhibit No. 19 - 1,000 matches, 

 State's Exhibit No. 20 - Sack of matches.


 Detective Parrish further testified that State's Exhibits 1 through 20 were all items
he had seen in prior investigations of methamphetamine-related offenses, and were
commonly seen "in methamphetamine labs or the manufacturing of methamphetamines." 
 The State also elicited testimony from Agent Kent Graham of the Deep East Texas
Regional Narcotics Task Force. Agent Graham stated that for the preceding four years his
primary focus in law enforcement had been on methamphetamine-related offenses. Graham
described in detail for the trial court the two primary types of methamphetamines
manufactured illegally by individuals. Graham confirmed the fact that all of the items
included in State's Exhibits 1 through 20 are items he would commonly expect to find in
a working methamphetamine laboratory. When asked if he was able to quantify the amount
of pseudoephedrine contained in State's Exhibits 10, 12, 13, 14, 15, 16, and 17, Graham
replied that by using the amounts listed on each package, he calculated a total of 5,760
milligrams of pseudoephedrine. He further testified that such an amount of
pseudoephedrine would yield approximately 3.5 grams of methamphetamine after
completion of the "cooking process." At the time of trial, the street value of
methamphetamine, according to Graham, was $100 per gram. Graham agreed with the
observation that, taken individually, each of State's Exhibits 1 through 20 can be purchased
legally in a grocery store, an automobile parts store, or a large discount retail
establishment. However, Graham confirmed that whenever he had seen the items
comprising State's Exhibits 1 through 20 "in a combination," an individual was either
actually manufacturing methamphetamines or preparing to manufacture it. Graham
concluded his testimony with the observation that the only items appellant would have
needed to "start cooking," in addition to State's Exhibits 1 through 20, were iodine crystals
and a reaction vessel. 

 In his defense, appellant called his common-law wife, Hope McWhorter, as a
witness. She testified that appellant was in possession of the pseudoephedrine tablets
because he suffers from allergies. She stated that because the tablets are expensive,
whenever they get extra money appellant purchases a few more boxes so that he will not
run out as he takes "two a day." Ms. McWhorter further testified that in the four years she
had known appellant she had never known him to make methamphetamine. She was aware
that appellant smoked marijuana, but had never known him to use methamphetamines. On
cross-examination, Ms. McWhorter stated she was aware of appellant's 1997 conviction in
Montgomery County for possession of methamphetamines. She attributed this conviction
to the occasion when appellant, driving his truck, picked up a friend, and the friend placed
a bucket containing some "bombs" and "some drugs" in the back of appellant's truck. 
After clarifying for the trial court that the "bombs" were indeed explosive devices, Ms.
McWhorter indicated that "the officers" told appellant that he could admit to one offense
[possession of controlled substance] and only be charged with one offense, or he could deny
involvement and be charged with two offenses because the contraband items were found in
his truck. Ms. McWhorter also indicated that since appellant's arrest for the instant charge,
Scott Watson admitted that some of the matches, the funnel, the scraper, and the "Heet"
belonged to him.

 As we noted above, as the finder of facts, the trial court was free to evaluate the
credibility of the witnesses, determine the weight to be given any item of evidence, and
resolve any conflicts in the evidence. See Joseph, 897 S.W.2d at 376. Considering the
record-evidence in the light most favorable to the verdict, we find that any rational trier of
fact could have found that, on the day in question, appellant possessed pseudoephedrine
with the intent to manufacture methamphetamines, in violation of section 481.124(a)(3). 
As noted above, appellant has waived his first issue; issue two is overruled. The trial
court's judgment is affirmed.

 AFFIRMED. 





 ______________________________

 STEVE MCKEITHEN

 Chief Justice



Submitted on February 17, 2005

Opinion Delivered April 6, 2005

Publish


Before McKeithen, C.J., Gaultney and Horton, JJ.
1. Section 481.124 was amended by the legislature in 2003. See Act of May 22,
2001, 77th Leg., R.S., ch. 1188, § 7, 2001 Tex. Gen. Laws 2691, amended by Act of
May 28, 2003, 78th Leg., R.S., ch. 570, § 2, 2003 Tex. Gen. Laws 1931. The
amendment to section 481.124 took effect on September 1, 2003. In the instant case, the
indictment alleges appellant committed the offense on or about February 19, 2003. 
Therefore, in an attempt to lessen confusion, all references to section 481.124 will be to
the version in effect at the time of the offense. Also, all section numbers mentioned will
apply to the Texas Health and Safety Code Annotated in effect at the time the offense was
committed, unless otherwise indicated. 
2. Appellant specifically frames his insufficient evidence complaint as a lack of
evidence to prove he possessed the right "form" of pseudoephedrine so as to support his
conviction under section 481.124(a)(3). His only other claim is the lack of legally
sufficient evidence to show his possession of pseudoephedrine was with intent to
manufacture methamphetamine. Appellant does not complain of the State's failure to
chemically analyze the tablets contained in State's Exhibits Nos. 10, 12, 13, 14, 15, 16,
and 17 so as to confirm the presence of either ephedrine or pseudoephedrine. As appellant
basically admits to being in possession of pseudoephedrine, although he claims it was in
the "wrong" form, it is not necessary for us to discuss the "affirmative links' rule," which
is normally triggered when an accused is not in exclusive possession of the place where
contraband is found. See Poindexter v. State, 153 S.W.3d 402, 406 (Tex. Crim. App.
2005). 
3. Like section 481.124, section 481.077 was also amended by the legislature in
2003. See Act of May 9, 2001, 77th Leg., R.S., ch. 251, § 12, 2001 Tex. Gen. Laws
466, 471, amended by Act of May 28, 2003, 78th Leg., R.S., ch. 570, § 1, 2003 Tex.
Gen. Laws 1931; Acts of May 29, 2003, 78th Leg., R.S., ch. 1099, § 6, 2003 Tex. Gen.
Laws 3148, 3152. As the current version of section 481.077 was not in effect on the date
of the instant offense, we again confine all references in the opinion to the version in effect
on February 19, 2003. 
4. While section 481.002 was amended by the 2003 legislature, subsection (51) was
not affected. Therefore, both ephedrine and pseudoephedrine continue to be defined as
chemical precursors in the Health and Safety Code. 
5. Testimony indicated that this scanner was the property of the Camilla Fire
Department, located in San Jacinto, County, Texas, and that appellant's stepfather was a
volunteer firefighter for that department.