In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00452-CR**
_____

**DIANTE MALIK BURRELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 17-28338**

## MEMORANDUM OPINION

Javonte Jack died from a gunshot wound he received on November 7, 2017. A grand jury indicted Appellant Diante Malik Burrell for "intentionally and knowingly caus[ing] the death of an individual, namely: Javonte Jack, [] the Complainant, by shooting Javonte Jack with a firearm[.]" Burrell pleaded "not guilty," and a jury found Burrell guilty of the murder and assessed punishment at ten

years of imprisonment.[1] Burrell timely filed a notice of appeal. In two issues, Burrell challenges the sufficiency of the evidence supporting the jury's verdict. We affirm.

Evidence at Trial

Testimony of Officer Shannon Meaux

Shannon Meaux, an officer with the Port Arthur Police Department, testified that on the night of November 7, 2017, police received a call of shots fired at the Avery Trace Apartments. The call reported that a person had possibly been hit, and when he arrived, a young man was lying in the grass near Building 4120. According to Meaux, near the man was a breezeway that separated the apartments in the building. Fire department and EMS personnel also arrived at the scene.

Meaux testified that he worked to secure the scene and protect evidence from contamination, and bystanders pointed out spent shell casings to the police at the scene. Meaux thought the casings were .38 caliber but he later learned they were .223 rifle rounds. Meaux also talked with Latoya,[2] a witness at the scene, who directed Meaux to the parking lot where Meaux found "a small, blue plastic baggie, like a Ziplock baggie [and] what appeared to be a wadded up receipt." According to Meaux, the receipt was later determined to be from a Dollar General store in Nederland.

---

[1] *See* Tex. Penal Code Ann. § 19.02(b)(1).
[2] We use pseudonyms to refer to the witnesses who were not affiliated with law enforcement.

Testimony of Leesa Bigelow

Leesa Bigelow, a civilian crime scene investigator with the Port Arthur Police Department, testified that she was dispatched to the Avery Trace Apartments on November 7, 2017, to collect evidence. Bigelow identified the crime scene as Building 4120 and the parking lot. She identified State's Exhibit 1 through 13 as photographs of the scene that night, and she testified that the photos depict three shell casings. Bigelow also identified State's Exhibit 12 as a receipt from a Dollar General store and Exhibit 14 as a still photograph made from video obtained from the Dollar General, and she identified Diante Burrell as the person in the photograph. Bigelow testified that the receipt was found in a parking lot at the scene, and it was time-stamped 10:42:56 on November 7, 2017 and reads "[h]and towel, gray." Bigelow identified a gray hand towel in the photograph in Exhibit 14. Bigelow identified State's Exhibit 15 as a video of the scene she made about a week before trial, and she testified that the video depicts what she saw while crossing a parking lot and walking through a breezeway between apartments 106 and 108 to another parking lot and a grassy area where Javonte Jack was found.

Testimony of Tina

Tina testified that she was living in apartment 106 at the Avery Trace Apartments on November 7, 2017, and that Javonte Jack—her children's uncle— had come to her apartment that night at about 8:00 p.m. Tina testified that Javonte

3

had a black backpack with him that night and several hundred dollars. According to Tina, at one point, Javonte stepped outside, she could hear two people arguing just outside her apartment door, she heard Javonte say "You ain't got to fire me up[]" twice, and then she heard about fifteen gunshots. Tina testified that her grandmother opened the sliding glass door in the bedroom and found Javonte lying on the ground. Tina saw that Javonte had been shot, he looked scared, but he could not talk. According to Tina, Javonte was fully dressed but his pants were around his ankles and he did not have his backpack. Tina did not know whether Javonte had a gun that night or who shot first.

Testimony of Latoya

Tina's cousin Latoya testified that on November 7, 2017, she lived at the Avery Trace Apartments. Latoya testified that she looked out her window that night and saw a white Camaro pull up, and a Caucasian woman was driving. Latoya recalled that she saw the woman get into the back seat of the car and she saw two Black men got out of the car. According to Latoya, one of the men had a low top haircut and wore a black hoodie and black pants, and the other had dreadlocks and wore camouflage. The man with the short hair had a long gun, the other man had a handgun, she saw the men run toward one of the apartment buildings and go into the breezeway by Tina's apartment, and then she heard gunshots. After the gunshots, Latoya saw the two men run across the parking lot back to the white car and then

4

drive away fast. Latoya recalled that the man with the long gun had something covering the gun that might have been a towel, and she agreed that the towel pictured in State's Exhibit 14 looked like the towel she saw. After the car sped away, Latoya called 911, and when she went to check on Tina, she saw Javonte lying on the ground. When the police arrived, she spoke with them.

Testimony of Connie

Connie testified that she stayed at Diante Burrell's mother's home on the night of November 7, 2017, and she slept on the couch. Connie recalled that seven or eight people stayed at the house that night, including Kirsten, Diante's mother, and three men. When Connie woke up the next morning, she heard Diante run out the front door, she saw that he was carrying a small black gun, and police officers were outside the house. Connie did not recall seeing Walter Jones at the house that night.

Testimony of Kirsten

Kirsten testified that in the timeframe of November 7-8, 2017, she was dating Diante Burrell. Kirsten recalled that, on November 7, while she and Diante's mother were at a nail salon, she received a call from Walter Jones asking her to pick him up because an altercation had occurred at the Avery Trace Apartments. Kirsten testified that she told Walter she could not come just then, but after returning home, Diante told her they needed to pick up Walter. According to Kirsten, she drove her white Camaro to the apartments, and Diante and Ethan went with her to pick up Walter.

5

Kirsten testified that she pulled into the parking lot, and after talking with Walter and another friend, she got into the back seat, and Diante, Ethan, and Walter "kind of jogged[]" to a different section of the apartment complex and through a breezeway. Kirsten then heard five or six gunshots, and then a couple more gunshots, and she thought it sounded like different guns had been fired. Kirsten testified that Walter, Ethan, and Diante then ran back to her car, and she saw they were carrying pistols, she knew that Diante carried a pistol, but she did not recall seeing guns when they drove to the apartments. According to Kirsten, Diante told her a shooting had happened and after she received calls from people saying her car had been involved in a shooting, she moved her car to her own home in Groves but returned to the Burrell home. Kirsten recalled that at some point, someone picked up Walter, and the next morning, police were at the house. Kirsten gave a statement to police at the police station. She also testified that Walter is just over six feet tall and has long dreads.

Testimony of Javonte's Mother

Javonte's mother testified that she dropped Javonte off at the Avery Trace Apartments on the night of November 7, 2017. She testified that it was common for Javonte to carry a backpack, Javonte was saving money to buy his son a car, and she had given Javonte $100 that day.

Testimony of Detective Terry Cater

Detective Terry Cater, with the Port Arthur Police Department, became involved in this case after a briefing on November 8, 2017, and to assist with a cell phone dump of Javonte Jack's phone. At the briefing, he learned that two Black males and a White female had been located at a specific residence, and upon arriving at the residence, he saw a white vehicle, but not the Camaro officers were looking for. Cater observed Diante Burrell running out of the front door of the house carrying a black semiautomatic handgun. Cater ordered Diante to drop the gun and stop, but Diante did not, and Cater followed Diante through an alley and ultimately observed Diante throw the gun over the seawall into the ship channel. Cater testified that two other officers arrested Diante, and a dive team ultimately retrieved the gun.

Testimony of Sergeant John Fontenette

Sergeant John Fontenette with the Port Arthur Police Department testified that on November 8, 2017, he was called to transport Diante Burrell. Fontenette identified State's Exhibit 17 as a recording made from his body camera that depicted him getting ready to transport Diante to the county jail when Diante was in custody, and the exhibit was published to the jury. Fontenette testified that, in the video, he could see news reporters standing outside the door waiting for Fontenette to walk outside with Diante. On cross-examination, Fontenette agreed that in the video, he could hear Diante say "I'm innocent. [] They shot first." Also in the video, Diante

can be heard to say "Self-defense. [] He shot at me first[,]" and "They're hating on me. [] I got something they don't have."

Testimony of Detective LaKeisha Thomas

Detective LaKeisha Thomas, with the Port Arthur Police Department, testified that she became involved in this case after a briefing on the morning of November 8, 2017. After the briefing, she drove to an address on 4th Street where she observed a white vehicle and two people who matched descriptions given during the briefing—a Black male with dreadlocks and a White female. Thomas recalled that she called for backup, and after someone inside the home fled the residence, Major Cole and Detective Cater chased after that person.

Testimony of Brandy Henley

Brandy Henley testified that she is a forensic firearms examiner, and she has worked for the Jefferson County Regional Crime Lab for about thirteen years. Henley testified that ten items she examined in this case were casings or fired copper-jacketed bullets, of which two were hollow-point bullets. According to Henley, one item was found in a breezeway, two items were found inside an apartment, and another was found in a parking lot. Henley testified that two hollow-point bullets were from the autopsy of Javonte Jack. Henley further testified that four of the items were .38 9mm caliber projectiles from the same firearm and two items were in the .40 10mm caliber class. Henley was unable to determine the caliber class

8

of one item. Henley determined that three items were fired from the same firearm and two others were fired from the same firearm. Henley agreed that the items retrieved from the autopsy were fired from the same firearm and not a 7.62 or .40 caliber weapon. She also agreed that the firearm retrieved from water did not fire any of the shell casings they found at the scene and it did not fire any of the projectiles retrieved in the autopsy.

Henley examined the photographs in State's Exhibits 6 through 9, which she had not seen before trial, and she testified that they appeared to be fired cartridge cases and appeared to be handgun or pistol ammunition. After examining State's Exhibits 6 and 22, Henley agreed that Exhibit 6 looked more like handgun caliber and Exhibit 22 looked more like rifle caliber.

Testimony of Dr. John Wayne

Dr. John Wayne, a forensic pathologist with Forensic Medical Management Services, testified that he reviewed the autopsy report of Javonte Jack that was prepared by his colleague Dr. John Ralston, who at the time of trial was working in another state. Dr. Wayne testified that the autopsy determined that the manner of death was homicide, and the cause of death was multiple gunshot wounds. Wayne testified that Exhibit 27, an autopsy photograph, depicted three gunshot wounds. He also testified that the autopsy photographs depicted a gunshot wound in the hip and left thigh area, in the left leg near the knee, in the right groin area, and to a finger.

9

The defense did not offer any witnesses or admit any evidence at trial.

## Sufficiency of the Evidence

Appellant's first issue challenges the sufficiency of the evidence to support the conviction. Appellant argues there is no evidence that he acted intentionally or knowingly to cause the death of Jack either as a principal or as a party and there was no evidence that Appellant fired any shot or participated in firing any shots. Appellant argues that "[t]he totality of the evidence indicates that appellant was merely present and did not participate in the alleged offense." Appellant also argues that under the jury charge given in this case, the jurors could only convict him if they found that he caused Javonte's death "as a party to Walter Jones' actions[]" and that no rational trier of fact could have found all the essential elements beyond a reasonable doubt. According to Appellant, his conviction "necessarily relies on speculative views of the evidence."

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational fact-finder could have found the essential elements of the offense beyond a reasonable doubt.[3] We give deference to the fact-finder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences

---

[3] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

from basic facts to ultimate facts.[4] If the record contains conflicting inferences, we must presume that the fact-finder resolved such facts in favor of the verdict and defer to that resolution.[5] While a jury is permitted to draw reasonable inferences from the evidence, it is not permitted to draw conclusions based on speculation or factually unsupported inferences or presumptions.[6] The jury as fact-finder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties.[7]

We also "'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'"[8] "Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'"[9] Each fact need not point directly and independently to the guilt of the

---

[4] *Hooper*, 214 S.W.3d at 13.
[5] *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).
[6] *See Hooper*, 214 S.W.3d at 15.
[7] *See Metcalf v. State*, 597 S.W.3d 847, 865 (Tex. Crim. App. 2020) (citing *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995)).
[8] *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 16-17).
[9] *Id.* (quoting *Hooper*, 214 S.W.3d at 13).

defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.[10]

A person commits murder if he "intentionally or knowingly causes the death of an individual[.]"[11] "Murder is a 'result of conduct' offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death."[12] A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.[13] A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.[14]

"Intent and knowledge are fact questions for the jury[] and are almost always proven through evidence of the circumstances surrounding the crime."[15] The jury may infer intent from any facts that tend to prove its existence, including the acts, words, and conduct of the defendant.[16] Intent to kill may also be inferred from the nature and extent of the injuries inflicted on the victim, the method of committing

---

[10] *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013); *Hooper*, 214 S.W.3d at 13; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

[11] Tex. Penal Code Ann. § 19.02(b)(1).

[12] *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003).

[13] Tex. Penal Code Ann. § 6.03(a).

[14] *Id.* § 6.03(b).

[15] *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring); *see also Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003).

[16] *Manrique*, 994 S.W.2d at 649.

the crime, the size and strength of the parties, and the defendant's flight from the scene.[17] A jury may also infer knowledge from such evidence.[18]

Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both."[19] Culpability under the law of parties does not distinguish between principals or accomplices.[20] "'Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement.'"[21] Party participation may be shown by events occurring before, during, and after the commission of the offense, and may be demonstrated by actions showing an understanding and common design to do the prohibited act.[22]

---

[17] *See id.* (noting that intent may be inferred from "the method of committing the crime and from the nature of [the] wounds inflicted on the victim[]"); *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995) (concluding that intent may "be inferred from the extent of the injuries and the relative size and strength of the parties"); *Wilkerson v. State*, 881 S.W.2d 321, 324 (Tex. Crim. App. 1994) (considering the nature of the injury inflicted and the defendant's flight from the scene, among other facts, in concluding that the evidence was sufficient to support the jury's finding of intent to kill); *Felder v. State*, 848 S.W.2d 85, 90 (Tex. Crim. App. 1992) (considering the number and location of the stab wounds inflicted on the victim in examining the sufficiency of the evidence to support intent to kill finding).

[18] *Manrique*, 994 S.W.2d at 649.

[19] Tex. Penal Code Ann. § 7.01(a).

[20] *See id.* § 7.01(c).

[21] *Salinas v. State*, 163 S.W.3d 734, 739-40 (Tex. Crim. App. 2005) (quoting *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994)).

[22] *Id.*

The jury charge instructed that, in order to find Burrell guilty, the jury must agree on the following four elements beyond a reasonable doubt:

> 1. in Jefferson County, Texas, on or about November 7, 2017, Walter Jones caused the death of an individual, Javonte Jack, by shooting Javonte Jack with a firearm; and
> 2. Walter Jones did this intentionally or knowingly; and
> 3. the defendant solicited, encouraged, directed, aided, or attempted to aid Walter Jones to commit the offense of murder; and
> 4. the defendant acted with the intent to promote or assist the commission of the offense of murder by Walter Jones.

We determine the sufficiency of the evidence with reference to a hypothetically correct jury charge.[23] A hypothetically correct charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried."[24] Where, as here, the State has tried the case under a party theory of liability, a hypothetically correct jury charge would state that the defendant "was criminally responsible as a party to the offense of murder committed by another if acting with the intent to promote or assist in the commission of the murder, he solicited, encouraged, directed, aided or attempted to aid the other person to commit the murder."[25]

---

[23] *See Garcia v. State*, 578 S.W.3d 106, 123 (Tex. App.—Beaumont 2019, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

[24] *Malik*, 953 S.W.2d at 240; *see also Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).

[25] *See Garcia*, 578 S.W.3d at 124 (citing Tex. Penal Code Ann. §§ 7.01(a), 7.02(a)(2), 19.02(b)(1)); *see also Adames v. State*, 353 S.W.3d 854, 862-63 (Tex.

14

Kirsten testified that Walter called her on November 7 to pick him up because an altercation had occurred at the Avery Trace Apartments. She also testified that later in the day, Diante told her they needed to go pick up Walter. Kirsten testified that, after driving to the Avery Trace Apartments, Walter, Ethan, and Diante went through a breezeway toward an apartment where Tina lived and where Tina testified Javonte was visiting that night. Kirsten then heard numerous gunshots, after which Walter, Ethan, and Diante ran back to the car, and she could see they had guns. Diante then told Kirsten there had been a shooting. Tina testified that after Javonte walked out of her apartment, she heard people arguing, she heard Javonte say "You ain't got to fire me up[,]" and then she heard gunshots. Tina also testified that Javonte was found lying on the ground near her apartment with his pants around his ankles but without his backpack. Tina thought someone might have taken the money she had seen Javonte counting earlier in the evening. Latoya testified that, from her apartment at the Avery Trace Apartments, she saw two men get out of a vehicle in the parking lot and run toward another apartment building, one man had a long gun, and the other had a handgun. Latoya observed the man with the long gun had something like a towel covering his gun. After Latoya saw the man run into the

Crim. App. 2011) (determining "[t]he court of appeals correctly applied the *Jackson* evidentiary-sufficiency standard to the hypothetically correct jury charge" in conducting its evidentiary-sufficiency review and correctly found that the evidence was legally sufficient to support his conviction as a party).

15

breezeway near Tina's apartment, she heard gunshots, and then she saw the men run back into the parking lot, get into a white car, and drive away fast. Officer Meaux testified that a receipt from Dollar General was found in the parking lot, and Latoya testified that the receipt was dated November 7, 2017, and the receipt was for a gray towel. Latoya testified that the man with the long gun had something covering the gun that might have been a towel and that the towel pictured in a still photograph made from Dollar General video looked like the towel carried by the man she saw that had a long gun. A crime scene investigator also testified that the man in the photograph looked like Diante. The crime scene investigator also identified shell casings that were found in the breezeway near where Javonte was found from photo exhibits. A forensics firearms examiner testified the spent bullets found at the crime scene were of two different caliber classes. Dr. Wayne testified that Javonte died from multiple gunshot wounds. The video taken from Sergeant Fontenette's body camera as he was transporting Diante depicts Diante telling reporters "They shot first[,]" "Self-defense[,]" and "He shot at me first." When police went to the house where Diante was staying the day following the incident, Diante ran from police and threw a gun over the seawall.

On this record, we cannot say that the evidence of Appellant's guilt was only speculative. The jury could have made reasonable inferences from the evidence and found that the evidence showed beyond a reasonable doubt that Diante Burrell

16

"act[ed] with the intent to promote or assist in the commission of the murder, [and that] he solicited, encouraged, directed, aided or attempted to aid the other person to commit the murder."[26] Appellant's participation as a party to the offense could be inferred from events that occurred before, during, and after the commission of the offense.[27] The jury could also have inferred guilt from evidence that Appellant fled from police the day after the incident.[28] After reviewing all the evidence and viewing the evidence in the light most favorable to the verdict and applying a hypothetically correct jury charge, we conclude that a rational fact-finder could have found the essential elements beyond a reasonable doubt necessary to conclude that Appellant was criminally responsible under the law of parties for the offense of murder.[29] We reject Appellant's sufficiency challenge, and we overrule his first issue.

Self-Defense

Appellant's second issue argues that the State failed to prove beyond a reasonable doubt that Appellant did not act in self-defense. According to Appellant, the evidence "overwhelmingly established that, if Appellant shot [Javonte] directly

---

[26] *See Garcia*, 578 S.W.3d at 124 (citing Tex. Penal Code Ann. §§ 7.01(a), 7.02(a)(2), 19.02(b)(1)); *see also Adames*, 353 S.W.3d at 862-63.

[27] *See Salinas*, 163 S.W.3d at 740.

[28] *See Devoe v. State*, 354 S.W.3d 457, 470 (Tex. Crim. App. 2011); *Alba v. State*, 905 S.W.2d 581, 586 (Tex. Crim. App. 1995) (citing *Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989); *Hill v. State*, 161 S.W.3d 771, 776 (Tex. App.—Beaumont 2005, no pet.).

[29] *See Malik*, 953 S.W.2d at 240; *Hooper*, 214 S.W.3d at 13; *Garcia*, 578 S.W.3d at 123.

or as a party, the shooter was likely acting in self-defense since [Javonte] fired first[.]"

A person commits murder if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes death.[30] Texas recognizes the general defense of justification, which excludes criminal responsibility for otherwise criminal behavior.[31] Self-defense is one form of justification.[32] A person is justified in using deadly force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force, and when and to the degree that he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force.[33]

The defendant has the initial burden to produce some evidence to support a claim of self-defense.[34] Generally, once a defendant produces some evidence raising the issue of self-defense, the State bears the burden of persuasion to show beyond a reasonable doubt that the defendant's actions were not justified.[35] "[A] defendant

---

[30] Tex. Penal Code Ann. § 19.02(b)(1), (2).
[31] *Id.* § 9.02.
[32] *Id.* § 9.31.
[33] *Id.* § 9.32(a).
[34] *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003).
[35] *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991); *Valverde v. State*, 490 S.W.3d 526, 527-28 (Tex. App.—San Antonio 2016, pet ref'd).

bears the burden of production and the State bears the burden of persuasion on a defense under Penal Code section 2.03."[36] To meet its burden, the State is not required to produce additional evidence.[37] If the jury finds the defendant guilty, it has made an implied finding against any defensive theory raised by the defendant.[38]

As stated in *Valverde*,

[w]hen a defendant challenges the legal sufficiency of the evidence to support the jury's implicit rejection of his self-defense claim, "we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." [39]

Self-defense is a fact issue to be determined by the jury, and the jury is free to accept or reject any defensive evidence on the issue.[40] In conducting a legal sufficiency review, we defer to the jury's assessment of the credibility of the witnesses and the weight to be given to their testimony.[41]

Appellant argues that video evidence showed him talking to reporters when he was arrested and the video depicted Appellant saying, "He shot at me first[]" and

---

[36] *Zuliani*, 97 S.W.3d at 594 n.5 (citing *Saxton*, 804 S.W.2d at 913-14).

[37] *Saxton*, 804 S.W.2d at 913; *Valverde*, 490 S.W.3d at 528.

[38] *Saxton*, 804 S.W.2d at 914; *Valverde*, 490 S.W.3d at 528 (citing *Zuliani*, 97 S.W.3d at 594).

[39] 490 S.W.3d at 528 (quoting *Saxton*, 804 S.W.2d at 914).

[40] *See Saxton*, 804 S.W.2d at 913-14.

[41] *Brooks*, 323 S.W.3d at 899; *Valverde*, 490 S.W.3d at 528.

that the State failed to introduce any contrary evidence. Tina testified that Javonte was visiting her on the night of the incident, she did not know whether Javonte had a gun that night, and she did not know who shot first. Tina also testified that when she went outside to where Javonte was lying, she did not see a gun near him. A police officer and a crime scene investigator testified that shell casings were found in the area near Javonte and in the adjacent parking lot, but they did not testify that they found a gun with Javonte. Kirsten testified that she saw Walter, Ethan, and Diante with guns when they were running back to the car at the Avery Trace Apartments the night of the incident, but she did not remember seeing the guns earlier. There was no evidence that Appellant or anyone else at the scene that night had a gunshot injury.

Because the jury charge included an instruction on self-defense, yet the jury found Appellant guilty, the jury implicitly rejected Appellant's claims that he acted in self-defense.[42] The jury could have disbelieved he acted in self-defense.[43] Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found against Appellant on his claim of self-defense.[44] We overrule Appellant's second issue.

---

[42] *See Zuliani*, 97 S.W.3d at 594-95.

[43] *See Metcalf*, 597 S.W.3d at 865; *see also Jones v. State*, 984 S.W.2d 254, 258 (Tex. Crim. App. 1998) (explaining that a jury is free to disbelieve a defendant's statement that he acted in self-defense).

[44] *See* Tex. Penal Code Ann. §§ 9.31, 9.32; *Saxton*, 804 S.W.2d at 913-14.

Having overruled both of Appellant's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on March 2, 2021
Opinion Delivered May 19, 2021
Do Not Publish

Before Golemon, C.J., Horton and Johnson, JJ.

21